ANDREW, J.T.C.
In this state tax action, plaintiff Chemical Realty Corp. challenges an assessment made by defendant Director, Division of Taxation under the Corporation Income Tax Act, N.J.S.A. 54:10E-1 et seq., for the taxable year ending December 31,1974. Although a number of questions have been presented, the primary issue is whether New Jersey has jurisdiction to tax plaintiff’s interest and other income from loans secured by New Jersey realty. The parties have stipulated the following facts.
Plaintiff, a New York corporation, is a wholly owned subsidiary of Chemical New York Corporation, a registered bank holding company. Plaintiff filed New York State and New York City corporation tax returns as a member of the Chemical New York Corporation consolidated group for the year in question. During the assessment period, plaintiff had no offices in New Jersey, nor in any state other than New York. Plaintiff had no employees based in New Jersey, although a few employees spent some time here in connection with plaintiff’s business activities. Plaintiff did not maintain any bank accounts in this state and had no equipment or any other personal property in New Jersey. It had no mailing address or telephone listing in this state.
Plaintiff is engaged in the business of real estate financing, lending money for short-term construction loans, land development loans, and interim loans. During the period in question here, plaintiff was involved in six financing transactions, to be described in more detail, which were secured by New Jersey realty. One of these transactions was a direct loan to a New Jersey corporation and five of the transactions were “participations”. In these participations a correspondent bank or “lead *584 bank”, negotiated and executed loans with New Jersey mortgagors. Plaintiff was not a direct party to these loans but, rather, purchased a percentage interest in the loans from the lead bank in each case. The lead bank conducted the usual preliminary loan processing activities. All of the loans were negotiated and executed by the New Jersey lead banks in New Jersey,[1] and were secured by New Jersey real property. First mortgage liens were given to the lead institutions and were recorded in various county recording offices of this State.
The lead banks contacted plaintiff in New York to solicit its purchase of participations in these loans. Although the details of each participation were outlined to plaintiff by the lead banks before the direct loan between the lead banks and the mortgagors were executed, the participation agreements between the lead banks and plaintiff were executed after the loans between the lead banks and the mortgagors were made.[2]
Plaintiff received information relevant to each loan, including a full set of loan closing documents, for its evaluation of each proposal. Most of - plaintiffs evaluation activities occurred in New York, and most of the negotiations took place by telephone and correspondence, but plaintiff’s employees from time to time visited the New Jersey offices of some of the lead banks and inspected some of the New Jersey construction sites, either before or after execution of the participation agreements. All participation agreements were executed and closed in New York. Plaintiff made all loan advances from its New York offices, and received all interest and other payments there.
One of plaintiff’s five participations was a 40% ($6,000,000) participation in a $15,000,000 land development loan made to the Evesham Corporation for the purposes of satisfying an existing *585 $3,000,000 mortgage and providing financing for the development of 860 acres of a 2,000 acre planned community located in Burlington County, New Jersey. Although plaintiff entered into the participation agreement with the lead bank, Midlantic National Bank (formerly National Newark and Essex Bank), on February 27, 1973, exhibits submitted in connection with the stipulations indicated that plaintiff’s employees had approved the proposed transaction in October, 1972. Plaintiff received a $60,000 commitment fee on the loan. Midlantic held a note and first mortgage, both dated February 6,1973, on the real property and improvements. The mortgage was recorded in the Burlington County Clerk’s Office.
The Evesham development project suffered from lack of sales and, ultimately, in 1976, the lenders participating in the loan agreed to take title to the New Jersey real property in lieu of foreclosure. Midlantic acquired title to the property and entered into a new participation agreement with plaintiff and a third participant whereby the parties were designated tenants in common with fee interests in accordance with their participating shares. A memorandum of this agreement was recorded in Burlington County. Plaintiff’s books were noted to reflect the property as owned real estate. In connection with these transactions, the participants, including plaintiff, retained a New Jersey law firm and shared all expenses.
A second participation was a 50% interest in a $7,000,000 construction mortgage loan[3] to Arrow Properties, Inc., sponsored by Hovnanian Enterprises, Inc. The lead bank in this case was First Jersey National Bank, Jersey City, New Jersey, which closed the loan on July 14, 1973. The participation agreement was entered into on July 26,1973, and matured on July 13,1974, but plaintiff had the option to extend the maturity of the participation which it exercised from 1974 through 1980.
*586 The purpose of the loan was to provide part of the development and construction costs of a condominium project to be built on approximately 313 acres in Monmouth County, New Jersey. First Jersey held a first mortgage lien on about 181 acres of the real property and improvements, and a second mortgage lien on 132 acres. The mortgages were recorded in Monmouth County.
First Jersey solicited plaintiff’s participation in a March 1973 telephone conversation, followed by a letter. Plaintiff’s review of the proposal included receipt of a full set of the loan closing documents and a personal inspection of the project at the Hovnanian office in Englishtown, New Jersey. Plaintiff received half of the $60,000 commitment fee paid by the borrower. During 1974 plaintiff’s employees met in New Jersey with representatives of First Jersey and Arrow on at least two occasions to review the financial status of the development, inspect the project, and discuss future loan participation commitments.
Plaintiff’s third transaction was a 50% participation in a $2,200,000 construction loan made by New Jersey Bank to a limited partnership, Fairfield Motor Lodge Associates, Inc., Linden, New Jersey, which used the business address of Prime Mortgage Co., Clifton, New Jersey. The purpose of the loan, which matured on October 15, 1974, was to provide part of the construction cost of a hotel located in Fairfield, New Jersey. Plaintiff entered into the participation agreement with New Jersey Bank on or about March 27,1974 and received no portion of the commitment fee. It was not stipulated, nor do any of the exhibits indicate when the loan was made by New Jersey Bank to the borrower. The collateral was a first mortgage lien on the borrower’s leasehold interest in the realty and the improvements to be erected thereon. The fee owner joined in the mortgage, subordinating its fee interest. The stipulations do not indicate whether the participation agreement was recorded and do not provide details of the mortgage recordation. One of plaintiff’s employees apparently visited the construction site shortly before the participation agreement was executed.
*587 Plaintiff’s fourth participation transaction during the assessment period, a 50% interest in a $3,000,000 loan made to Turnpike Plaza, a limited partnership located in East Brunswick, New Jersey using the business address of Prime Mortgage Company, Clifton, New Jersey was entered into on or about March 27, 1974. The purpose of the loan was to provide a portion of the construction costs for a hotel in East Brunswick, New Jersey. The lead bank is listed as New Jersey Bank which received a commitment fee of 1%, but did not advance any of the funds for the loan. The exhibits state that the collateral in this case was a first mortgage lien on the borrower’s fee interest in the realty and the improvements to be erected thereon. Again, nothing is stated as to whether the participation agreement was recorded. No details of the mortgage recordation were provided.
Plaintiff’s final participation was an 81.2% interest in a $5,850,000 construction loan made by Republic Mortgage Investors of Coral Gables, Florida, to Newark Airport Hotel Associates (Newark), a New Jersey limited partnership. The purpose of the loan was to provide a portion of the construction costs of a motor inn located near Newark Airport. The loan between Republic and Newark was closed on July 26, 1973, and the participation agreement between Republic and plaintiff was executed on August 3, 1974. A notice of the participation was filed in the Union County Register’s Office.
Plaintiff was shown to have a co-first mortgagee interest in the property and improvements on the builder’s risk insurance policy. Plaintiff required copies of inspection reports from a New Jersey architectural firm and copies of the title insurance endorsements from the New Jersey title insurance company before making any advances to Republic. The parties have stipulated that it is possible that plaintiffs employees conducted an onsite inspection and attended meetings in New Jersey, but most negotiation and evaluation activities, as well as the execution and closing of the participation agreement occurred in New York. As with other participations, plaintiff received and reviewed in its New York offices inspection, financial and other *588 reports, and, on occasion, conducted physical inspections of the New Jersey property before making advances.
During the assessment period, plaintiff made one direct construction mortgage loan secured by New Jersey real property. The loan, for which plaintiff received a commitment fee of $10,628.75, was made on October 22, 1974 to Goodrich Realty Group of New Jersey, Ltd., a New Jersey corporation with its principal office in New York City. The purpose of the loan was to provide a portion of the construction costs for a retail store and for the purchase of partially improved adjacent land in Toms River, New Jersey. Plaintiff had the right of first and last refusal for construction financing of any improvements to be constructed on the adjacent land.
In connection with the loan, Goodrich gave plaintiff a mortgage on the realty and the improvements to be erected, and also assigned to plaintiff leases relating to the property. These documents, as well as the building loan agreement and a UCC financing statement were filed with the Ocean County Clerk’s office.
The loan was initiated when the borrower contacted plaintiff in New York. The review and analysis of the loan application were accomplished in New York, and the loan itself was executed there. Plaintiff's employees occasionally visited the New Jersey construction site for physical inspections, and periodic inspections were also made by a New York engineering firm acting as an independent contractor for plaintiff. Plaintiff’s commitment letter to Goodrich reserved to plaintiff the right to request the borrower to erect a sign at the construction site, stating that plaintiff was financing construction of the project. There was nothing in the record to indicate that plaintiff did, in fact, have such a sign erected.
The mortgage provided that the note and mortgage were to be construed according to the laws of New York, except that, with respect to the remedies of the mortgagee, the laws of New Jersey were to apply where applicable.
*589 During the assessment period, the following amounts of interest accrued to and/or were received by plaintiff:[4]
Loan Interest
Evesham Corp. $ 411,714.93
Arrow 295,133.25
Fairfield Motor Lodge 81,927.12
Turnpike Plaza 116,812.71
Newark Airport Hotel Associates 171,772.88
Goodrich Realty Group 25,676.41
Total $1,103,037.20
On April 14,1975, plaintiff filed a notice of business activities report pursuant to N.J.S.A. 14A: 13-14 et seq., with the New Jersey Division of Taxation for the calendar year 1974, noting that it received interest and principal payments on loans from persons residing in this State or businesses located in New Jersey aggregating in excess of $25,000. On a rider to the report, however, plaintiff disclaimed liability for both the Corporation Business Tax, N.J.S.A. 54:10A-1 et seq. (CBT) and the Corporation Income Tax, N.J.S.A. 54:10E-1 et seq. (CIT). By letter dated April 16, 1975, the Division of Taxation advised plaintiff that since it had derived income from sources within New Jersey, it was required to file a corporation income tax return and pay the tax due for the taxable year ending December 31, 1974. The Division sent similar letters to other out-of-state entities that made loans secured by real property in New Jersey.
The Division received plaintiff’s 1974 corporation income tax return on November 5, 1975. The Division then requested that plaintiff supply it with information about all interest income received for loans to persons residing in or businesses located in New Jersey. Plaintiff submitted an allocation schedule reporting $902,000 as interest income accrued during 1974 on loans *590 secured by New Jersey real property. Plaintiff noted that “the loans in question were negotiated and are managed and controlled in New York,” that they “cannot be considered to have obtained a New Jersey situs,” and “cannot be construed to be derived from New Jersey sources.” On April 9, 1976, the Division sent plaintiff a notice of tax adjustment indicating a tax of $27,389.45 plus interest. Following a protest by plaintiff and a conference between the parties, plaintiff was notified that the Division had not changed its original determination. This appeal was brought and both parties have moved for summary judgment. R. 4:46-1.
Plaintiff contends that defendant’s assessment is invalid because: (1) the assessment is based on a rule not adopted in accordance with the Administrative Procedure Act, N.J.S.A. 52:14B-1 et seq. (APA); (2) plaintiff derives no income from New Jersey sources and is therefore not subject to the tax; (3) the assessment is violative of the due process, equal protection and commerce clauses of the United States Constitution. It is defendant’s position that he was not required to adopt an explicit regulation as a condition to the levying of the assessment, that the interest income received by plaintiff is taxable because it was derived from sources within New Jersey, and that the assessment does not violate any provisions of the Federal Constitution.
Because of the judicial reluctance to consider a constitutional issue or issues when there are alternative nonconstitutional issues which may be dispositive, this court will consider first the issues involving the APA and the construction of N.J.S.A. 54:10E-2. Donadio v. Cunningham, 58 N.J. 309, 277 A.2d 375 (1971).
I
Initially, it must be determined whether defendant was required by the APA to adopt a rule stating that interest income from a loan secured by New Jersey real property is subject to the corporation income tax. N.J.S.A. 54:10E-2 provides that:
*591 Every domestic and foreign corporation which is not hereinafter exempted shall pay an annual income tax for every calendar or fiscal year, or part thereof, ending after December 31,1973, as hereinafter provided, on income derived from sources within New Jersey during such year or part thereof. [Emphasis supplied].
The statute does not define the term “income derived from sources within New Jersey.”[5]
It is plaintiffs contention that the April 16, 1975 letter[6] sent to it by defendant, and similar letters sent to other entities that had made loans secured by New Jersey realty, represent an agency statement of general applicability and continuing effect that implements or interprets law or policy. It was stipulated by the parties that, during the assessment period, defendant took the position that corporate income derived from loans between corporations and New Jersey borrowers, or from loans secured by real property located in New Jersey, was to be included in the numerator of the receipts factor of the corporation income tax allocation formula set forth in N.J.S.A. 54:10E-6, when the loans related to economic or business activity in New Jersey, or resulted from the exploitation of the New Jersey market, or when New Jersey substantially afforded protections and gave benefits to the corporation’s enterprise within New Jersey involving the loans. Defendant did not promulgate any rules relating to the subjectivity of this type of income to the corporation income tax.
Plaintiff argues that defendant’s letters were an impermissible exercise of ad hoc rule-making, violating the notice and hearing requirements of the Administrative Procedure Act, N.J.S.A. 52:14B-1 et seq. (APA), and that the assessment is therefore void. See N.J.S.A. 52:14B-4(d), which provides that no rule *592 is valid unless adopted in substantial compliance with the notice and hearing requirements.
Defendant, on the other hand, asserts that the standard for subjectivity to the tax is plainly stated by the statute, namely, whether plaintiff has “income derived from sources within New Jersey.” Defendant contends that neither the Corporation Income Tax Act nor the APA requires him to adopt regulations prior to assessing the tax in question.
At the time in issue here, N.J.S.A. 52:14B-4(a) required that, prior to the adoption, amendment, or repeal of any rule, the administrative agency give at least 20 days’ notice[7] and afford all interested parties an opportunity to express their views, orally or in writing. “Rule” is defined at N.J.S.A. 52:14B-2. In relevant part, a rule is:
[E]ach agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency. The term includes the amendment or repeal of any rule... .
Plaintiff, in support of its position, cites cases which have recognized the importance of notice and public hearing in the administrative rule-making process. See, e.g. NLRB v. Wyman-Gordon Co., 394 U.S. 759, 777-778, 89 S.Ct. 1426, 1435-1436, 22 L.Ed.2d 709 (1969) (Douglas, J., dissenting); Writers Guild of America, West, Inc. v. F.C.C., 423 F.Supp. 1064, 1151-1153 (C.D.Cal.1976), vacated on jurisdictional grounds, sub nom. Writer’s Guild of America, West, Inc. v. American Broadcasting Co., Inc., 609 F.2d 355 (9th Cir.1979), cert. denied, 449 U.S. 824, 101 S.Ct. 85, 66 L.Ed.2d 27 (1980); Glaser v. Downes, 126 N.J.Super. 10, 312 A.2d 654 (App.Div.1973), certif. den. 64 N.J. 513, 317 A.2d 726 (1974).
Plaintiff also cites authority for the courts’ strong preference for formal rule-making over ad hoc adjudication. See SEC v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); In re Heller, 73 N.J. 292, 374 A.2d 1191 (1977). It notes that *593 even prior to the enactment of the APA, the New Jersey Supreme Court stated that agency rule-making was preferable to individual quasi-judicial determinations. See R.H. Macy & Co., Inc. v. Director, Div. of Taxation, 41 N.J. 3, 4, 194 A.2d 457 (1963); Boller Beverages, Inc. v. Davis, 38 N.J. 138, 155, 183 A.2d 64 (1962).
It is clear, however, that an agency may enforce a statutory provision without promulgating a rule pursuant to the provisions of the APA, if there is an adequate statutory standard for the guidance of the administrative agency. See Equitable Life Mort. v. N.J. Div. of Taxation, 151 N.J.Super. 232, 240, 376 A.2d 966 (App.Div.), certif. den. 75 N.J. 535, 384 A.2d 514 (1977); R.H. Macy & Co., Inc. v. Director, Div. of Taxation, 77 N.J.Super. 155, 180, 185 A.2d 682 (1962), aff'd 41 N.J. 3, 194 A.2d 457 (1963); Airwork Services Division v. Taxation Div. Director, 2 N.J. Tax 329, 341 (Tax Ct.1981), aff'd. o.b. per curiam 4 N.J.Tax 532 (App.Div.1982). While the statutory phrase “income derived from sources within New Jersey” is by no means as clear as defendant asserts,[8] there was a sufficient statutory standard for defendant to make the assessment in question without the prior promulgation of an administrative rule pursuant to the APA.
It is fairly evident that the Legislature, in enacting the corporation income tax, intended to reach all of the corporate income it possibly could. The Report of the New Jersey Tax Policy Committee, Part V, “Non-Property Taxes in a Fair and Equitable Tax System,” (February 23,1972) at 22, recommended the enactment of a “second tier” corporation income tax in addition to the already existing corporation business tax, N.J.S.A. 54:10A-1 et seq., because:
... [E]quity demands business carrying on activities in the State and exploiting the New Jersey market make some contribution to the costs of maintaining governmental operations and the services provided by the State....
*594 As enacted by L.1973, c. 170, the Corporation Income Tax Act was entitled, “An Act imposing a direct income tax on corporations deriving income from sources within this State, which are not subject to the tax imposed under the Corporation Business Tax Act.”
In connection with the Corporation Income Tax Act, the Legislature passed the Corporation Business Activities Reporting Act, N.J.S.A. 14A:13-14 et seq. That act’s purpose:
... is to enable the Division of Taxation to obtain pertinent data from any foreign corporation which carries on an activity or owns or maintains property in this State but which has not obtained a certificate of authority to do business in New Jersey, to the end that a proper determination may be made as to whether such corporation is subject to any State tax. [Associates Consumer Discount Co. v. Bozzarello, 149 N.J.Super. 358, 362, 373 A.2d 1016 (App.Div.1977)].
See also Equitable Life Mort. v. N.J. Div. of Taxation, supra 151 N.J.Super. at 234, 376 A.2d 966.
N.J.S.A. 14A:13-15 requires a foreign corporation which, among other things, receives payments from persons residing in this State, or businesses located in this State, aggregating more than $25,000 as plaintiff did here, to file a notice of business activities report. It would appear that the Legislature viewed the receipt of such payments as at least a preliminary indication that a foreign corporation derived income from sources within New Jersey and was subject to the corporation income tax. By filing its report, plaintiff was aware that defendant might indeed consider its income taxable without the prior promulgation of an administrative rule, despite its disclaimer of liability.
Moreover, the 1974 tax year at issue here was the first year for which the corporation income tax was effective. Similarly, this was the first year that plaintiff was required to file a notice of business activities report. It would seem premature for defendant to have promulgated a rule relating to the type of income involved here prior to the time that the Division had had an opportunity to examine plaintiff’s report. Defendant had had little experience with the new tax, and it would seem unreasonable to have expected him, as a condition of assessing tax under the Corporation Income Tax Act, to have promulgated rules covering every possible type of income subject to the tax *595 before having inspected any of the notice of business activities reports.
In SEC v. Chenery Corp., supra, a leading case in the area of administrative rule-making, the Court noted that not every administrative principle should be immediately cast in the form of a rule. Situations in which it was found particularly proper for an administrative agency to act on a case by case basis were those in which a particular problem was unforeseen or with which the agency had little experience. Id. 332 U.S. at 202, 67 S.Ct. at 1580. The principles enunciated in Chenery have been supported by the New Jersey courts. See In re Heller, supra.
In Airwork Service Division v. Taxation Div. Director, supra, the court explained:
The Legislature did not intend that the APA should impose unreasonable restraints upon the assessment of taxes by requiring that the validity of every assessment should be contingent upon the prior adoption of a regulation. Such an interpretation would require defendant to adopt regulations to meet every conceivable contingency that might arise in the context of future tax assessments, and would also jeopardize tax revenues which the Legislature directed the Division of Taxation to collect. ... [2 N.J.Tax at 341.]
The conclusion that defendant was not required to promulgate a rule pursuant to the APA before making the assessment in question is confirmed by previous holdings of the New Jersey courts, particularly with respect to those cases involving the authority of the Division of Taxation to assess taxes. See R.H. Macy & Co. Inc. v. Director, Div. of Taxation, supra; Metromedia v. Taxation Div. Director, 187 N.J.Super. 562, 455 A.2d 561 (App.Div.1983); Airwork Service Division v. Taxation Div. Director, supra.
Plaintiff cites two cases in which administrative actions were invalidated for failure to promulgate a rule. In Boller Beverages, Inc. v. Davis, supra, the Director of the Division of Alcoholic Beverage Control ruled that the sale of a brand of corn whiskey was illegal when packaged in Mason jar containers. The court set aside the ruling of the Director, finding that his action had no basis either in the controlling statute or in any administrative rule. Although the Director had been given a broad delegation *596 of rule-making authority, he had failed to promulgate a rule covering the situation at issue. The court noted that:
Where an administrative agent is given full rule-making power, he must in all fairness, bottom an alleged violation on general legislation before he may rule in a particular case. The general mandate, either statutory or administrative must precede the specific violation. [38 N.J at 155, 183 A.2d 64]
In the present case, the general mandate was present in the statute.
Glaser v. Downes, supra, involved an action brought by the' Director of the Division of Taxation in connection with the administration of a non-tax statute. The Director sought a permanent injunction against a service station operator barring him from distributing triple trading stamps conditioned on the purchase of motor fuel. The trial court went beyond the issue at hand, and also ruled that several other practices, including giveaways not conditioned on the purchase of motor fuel, were within the prohibition of the statute. The Director subsequently sent written notice to every licensed retail motor fuels dealer in the State, informing them that the various practices deemed illegal by the trial court were violative of the statute, and that, effective 15 days from the date of the notice, such violations would subject the dealer to the statutory penalties. Prior to this time, in accordance with an administrative rule, the policy of the Division has been to institute enforcement proceedings only with respect to giveaways conditioned on the purchase of motor fuels, but not against giveaways not so conditioned. The Appellate Division found that the Director’s notice was a rule within the meaning of the APA, and was also a repeal or amendment of an existing rule, since it offered a statutory interpretation different from that of the existing regulation. The court held that the rule was invalid because the Director’s written notice was not in compliance with the APA. Here, there was no previous statutory interpretation. At issue in the present litigation is defendant’s position since the effective date of the Corporation Income Tax Act.
Defendant additionally contends that his duty to assess the tax, set forth in N.J.S.A. 54:10E-19(a), is not dependent or *597 contingent upon the adoption of regulations, relying upon Airwork Service Division v. Taxation Div. Director, supra 2 N.J.Tax at 340. Defendant, in effect, claims that he is never under an obligation to comport with the requirements of the APA as long as he has the statutory authority to make an assessment. It is not necessary to address this argument in view of the finding that defendant had sufficient statutory guidance to make the assessment at issue. It should be pointed out, however, that defendant made a similar claim in Equitable Life Mortgage v. N.J. Div. of Taxation, supra. Equitable Life Mortgage involved a challenge to a tax assessment made pursuant to the Corporation Income Tax Act on the identical basis that is appealed here, but the court did not reach the merits. The court commented:
Wc do not pass upon the last of these contentions except to note our disinclination to approve an agency procedure which is intended either to bypass the notice and hearing requirements of the Administrative Procedure Act or which has that practical effect. [151 N.J.Super. at 240, 376 A.2d 966].
II
The next nonconstitutional issue that has been framed by the parties is whether the interest and special fee income from loans secured by New Jersey realty is “derived from sources within New Jersey.” It is obvious from the legislative history previously noted, that the corporation income tax was intended to reach income not touched by the corporation business tax. The legislative scheme indicates that defendant, upon examination of the notice of business activity reports, was to determine what income was properly taxable as “derived from sources within New Jersey,” and assess the tax accordingly.
Defendant contends he is limited only by the United States Constitution in making his assessments, and urges this court to hold that income derived from economic and market exploitation in New Jersey, including plaintiffs income at issue here, is within the intent of the statute, and does not violate the constitution.
Plaintiff contends that its interest and other income is not derived from New Jersey sources, and, thus, plaintiff is not *598 subject to the corporation income tax.[9] It argues that this court should apply the legal maxim mobilia sequuntur personam; that is, the situs of intangibles and their proceeds is, for tax purposes, the domicile of the creditor. Plaintiff argues that its loans to New Jersey borrowers have their situs in New York, its commercial domicile, and that its loan income is taxable by that state only. Plaintiff concedes that intangibles may be taxed by a state other than the domiciliary state when the intangibles have become an integral part of a business carried on by their owner in the taxing state. See Newark Fire Insurance Co. v. State Board of Tax Appeals, 118 N.J.L. 525, 527, 193 A. 912 (Sup.Ct.1937), aff'd. 120 N.J.L. 224, 198 A. 837 (E. & A. 1938), aff’d. 307 U.S. 313, 59 S.Ct. 918, 83 L.Ed. 1312 (1939). Plaintiff asserts, however, that this “business situs” exception to the maxim is not relevant because it is not carrying on any business here, and the intangibles have no situs in New Jersey.
The statute admittedly does not define the term “income derived from sources within New Jersey”, but does not exclude from taxation income such as plaintiff has received during the assessment period.[10] The cases relied on by plaintiff in support of the application of the mobilia sequuntur personam maxim do *599 not demonstrate that the Legislature intended to so restrict the taxation of intangibles.
Plaintiff asserts that the doctrine has long been accepted in New Jersey, citing Newark Fire Ins. Co. v. State Board of Tax Appeals, supra, which involved a personal property tax on intangibles. The court noted the existence of the maxim, but pointed out that:
The use of this maxim like the use of most other maxims in jurisprudence, is not the solution of the problem; it is merely a formal and unexplanatory statement of a legal conclusion ... Thus, frequently its use is not very helpful, [citations omitted] [118 N.J.L. at 527, 193 A. 912].
Much more recently, in the context of a different issue, the United States Supreme Court commented:
Although a fictionalized situs for intangible property sometimes has been invoked to avoid multiple taxation of ownership, there is nothing talismanic about the concepts of “business situs” or “commercial domicile” that automatically renders those concepts applicable when taxation from intangibles is at issue. The Court has observed that the maxim mobilia sequimtur personam, upon which these fictions of situs are based, ‘states a rule without disclosing the reasons for it.’ ... Moreover, cases upholding allocation to a single situs for tax purposes have distinguished income tax situations where the apportionment principle prevails, [citations omitted] [Mobil Oil Corp. v. Comm’r. of Taxes of Vermont, 445 U.S. 425, 100 S.Ct. 1223, 1235, 63 L.Ed.2d 510 (1980)].
The mobilia maxim, then, is by no means so generally accepted, particularly in an income taxation situation, that it can be concluded that the Legislature intended it to be applied to a determination of whether income was derived from sources within the State. Cases cited by both parties confirm that courts employ the maxim erratically, and that the decisions frequently utilize other grounds to reach a finding of taxability or non-taxability.
In Indiana Dept. of State Rev. v. J.C. Penney Co., 412 N.E. 1246 (Ind.Ct.App.1980), the court determined that service charge income of an out-of-state corporation from credit sales made within the state was not taxable under a statute imposing a gross income tax on income derived from activities or businesses *600 or any other source within Indiana.[11] The court made a factual finding that the local activities relating to the service charge income were too remote and incidental to subject the income to the tax. By way of additional support, the court noted the existence of an administrative regulation which, in effect, restated the mobilia maxim.
Plaintiff asserts that the Washington Supreme Court, in State Department of Rev. v. J.C. Penney Co., Inc., 96 Wash.2d 38, 633 P.2d 870 (Sup.Ct.1981) expressly adopted the holding in Indiana Dept. of State Rev. v. J.C. Penney Co., supra, with respect to the mobilia maxim. In actuality, and on facts similar to those of the Indiana case, the Washington court sustained a business and occupation tax on service charge income. The Washington opinion distinguished the Indiana decision on the basis that the Indiana statute taxed only those intangibles obtaining a legal situs within the state, which the Indiana court found not to exist because of insufficient local activities. The Washington statute, on the other hand, was intended to reach all business activity not yet taxed. The court stated:
The degree of activity is what the Indiana court balanced. The question in Washington is whether there is any business activity at all; if interstate in nature, the proper apportionment will be made. [633 P.2d at 875].
Pacific Telephone and Telegraph Co. v. Franchise Tax Board, 7 Cal.3d 507, 102 Cal.Rptr. 782, 498 P.2d 1030 (Sup.Ct.1972), cited by plaintiff, is also not helpful here. While the opinion states the mobilia maxim, the issue in the case was the extent of the interest expense deduction that should be allowed in computing the franchise tax, and not the taxability of income from intangibles.
State ex rel Manitowoc Gas Co. v. Wisconsin Tax Commission, 161 Wis. 111, 152 N.W. 848 (Sup.Ct.1915), did apply the mobilia sequuntur personam principle. The court disallowed an income *601 tax levied against non-resident bondholders on interest received from bonds secured by a trust deed on property located in the taxing state. The statute taxed income derived from sources within the state. The court found that the mere purchase of the bond was insufficient to constitute a taxable situs within the taxing state, and that the situs of the bond was the taxing state, and that the situs of the bond was the domicile of the bondholder. Apart from the fact that plaintiff’s activities here would seem to go beyond mere purchase, Manitowoc Gas Co. is not a persuasive indication that the New Jersey Legislature intended to exclude plaintiff’s income from the reach of the Corporation Income Tax Act. As distinguished from the other, more recent cases, the court mechanically applied the maxim without the recognition, as expressed in Mobil Oil Corp. v. Comm’r. of Taxes of Vermont, supra, and Newark Fire Ins. Co. v. State Board of Tax Appeals, supra, that the maxim is conclusory rather than explanatory.
Defendant relies on cases which found that the source of income was the person making the payment. In Arvey Corp. v. Fulgate, 129 Colo. 595, 272 P.2d 652 (Sup.Ct.), cert. den. 348 U.S. 871, 75 S.Ct. 106, 99 L.Ed. 685 (1954) the court found that an out-of-state corporation which had no manufacturing operations within Colorado was liable for income tax on the amount of a Colorado judgment which it had obtained against a Colorado corporation, and which represented gains and profits arising out of the Colorado operation of the Colorado corporation. The Colorado statute provided for taxation of income from sources within the state, and specifically included income from tangible or intangible property located or having a situs in Colorado. The court stated that the statute was broad and all inclusive, and found that the income in question had its origin with the Colorado corporation and that the source of the income was Colorado.
In John Hancock Mutual Life Ins. Co. v. Neill, 79 Idaho 385, 319 P.2d 195 (Sup.Ct.1957), the court held that interest income from bonds issued by corporations doing business in Idaho and purchased and held outside the state by out-of-state insurance *602 companies doing business in Idaho, was taxable. The tax in question was a franchise tax and was measured by interest, dividend and rent income arising within Idaho. The court found that the interest income arose within the state because the payors carried on business within the state, from the earnings of which the interest payments were made. Important to the court’s conclusion in this case, however, was another provision of state law that required insurance companies to invest in approved securities, which included the bonds purchased. Accordingly, while the court stated that the bonds did not have a business situs within the state because they were not employed by the taxpayers in their life insurance businesses there, the court concluded that the bonds and interest were related to the business done within the state.
Finally, defendant cites Capital Holding Corporation v. District of Columbia, 374 A.2d 573 (D.C.App.1977). In that case, a parent foreign corporation owning substantially all of the stock of its domestic subsidiary corporation, a life insurance company, was subjected to the District’s corporate franchise tax on dividends received from the subsidiary. Defendant relies on this case for the proposition that the parent was taxable on the dividend income as other income “derived from sources within the District,” even though the parent company was not engaged in any business within the District. This statement is misleading however, since the court remanded the case for a determination of whether the parent corporation was engaged in business within the District and, if the parent was not so engaged, for a determination of the proper construction of the word “sources”. The court commented that:
By construing the work “sources” to embrace a dividend not apportioned to its derivation from local business or fairly relating to services provided by the District, the trial court does not appear to have taken into account the constitutional limitations of our corporate franchise act. [Id. at 580-581].
An analysis of the decisional law demonstrates that, while the maxim mobilia sequuntur personam is sometimes utilized, the inquiry of the courts has been whether a “business situs” exception exists. Although the “business situs” exception has been framed in terms of whether the intangibles have become an *603 integral part of a business carried on by their owner in the taxing state, the courts actually appear to consider whether the intangible, its owner, and the taxing state have sufficient connections to satisfy due process.
This court, too, has occasionally utilized the mobilia maxim in cases concerning subjectivity to the corporation income tax. See Avco Fin. Services, etc. v. Taxation Div. Director, 4 N.J.Tax 349 (Tax Ct.1982); Tuition Plan of New Hampshire v. Taxation Div. Director, 4 N.J.Tax 470 (Tax Ct.1982); CIT Fin. Services, etc. v. Taxation Div. Director, 4 N.J.Tax 568 (Tax Ct.1982). These decisions, though, are based primarily upon findings of sufficient or insufficient contacts with this state to sustain the tax, and a determination of compliance with due process. To some degree, the court equated “nexus” in the constitutional sense with the business situs exception to the mobilia rule: if there was a sufficient connection with New Jersey to justify the tax, the intangible income had attained a business situs here, and thus, was concluded to be derived from sources within the State.
Plaintiff’s reliance upon defendant’s interpretation of the Corporation Business Tax Act, N.J.S.A. 54:10A -1 et seq., is not helpful here. Defendant concedes that during the period in question, the Division took the position that, in the case of corporations subject to the corporation business tax, corporation income derived from real estate financing loans was allocated to New Jersey only if the loan was managed or controlled here, or if the avails of the loan were applied or were intended to be applied in the conduct of the corporation’s business here, or if the loan became an integral part of the corporation’s business conducted in New Jersey. Plaintiff argues that the corporation income tax should be interpreted in the same way with regard to the taxation of intangibles.
First, if a corporation were subject to the corporation business tax, any loans such as plaintiff made here might be regarded as an integral part of the corporation’s business conducted here. Cf. J.B. Williams Co. Inc. v. Glaser, 114 N.J.Super. 156, 275 A.2d *604 447 (App.Div.1971). The income from such loans would then be included in the computation of the corporation business tax.
More importantly, there is no reason to believe that the Legislature intended to define the terms of the corporation income tax by way of reference to an administrative interpretation of the Corporation Business Tax Act. The corporation income tax was enacted to reach corporations not already subject to the corporation business tax. See Report of the New Jersey Tax Policy Committee, supra at 22. The title of the act, “An Act imposing a direct income tax on corporations deriving income from sources within this State which are not subject to the tax imposed under the Corporation Business Tax Act,” demonstrates that the Legislature meant to tax corporations on a different basis than for the privilege of exercising a corporate franchise, or for the privilege of doing business, or employing or owning capital or property or maintaining an office in this State. See N.J.S.A. 54:10A-2; Roadway Express, Inc. v. Director, Div. of Taxation, 50 N.J. 471, 236 A.2d 577 (1967), app. dism. 390 U.S. 745, 88 S.Ct. 1443, 20 L.Ed.2d 276 (1968).
The Report of the New Jersey Tax Policy Committee, supra at 20-22, upon whose recommendations the corporation income tax was enacted, was obviously concerned with the constitutional limitations on a state’s power to tax the income of out-of-state corporations. The aim of the new tax was to reach corporations which did not meet the requirements for subjectivity to the corporation business tax, but which still had sufficient connections with New Jersey to justify taxation. The Legislature used the phrase “income derived from sources within New Jersey” to express this concept.
The statutory scheme provided for the reporting of certain corporate activities that might be an indication of subjectivity to the new tax. N.J.S.A. 14A:13-15. Defendant was given the authority to assess the corporation income tax only when the assessment comported with constitutional requirements, and thus, could be deemed to have been derived from sources within *605 New Jersey. Ultimately at issue here then, is defendant’s application of the correct constitutional standards.
In this case, plaintiff’s income was received from New Jersey borrowers, either directly, or through the lead institution in its participation agreements. Facially, its income appears to have been derived from sources within New Jersey.
Plaintiff notes that its loans were construction and development loans rather than permanent financing, and that such properties are not themselves income producing. In effect, plaintiff argues that its interest income might be traced to a source other than New Jersey, and urges the application of the mobilia sequuntur personam maxim to provide certainty in the taxation of this type of income.
Plaintiff has produced no evidence to show that its income can be traced to another state. In the absence of a legislative intent that the mobilia maxim be construed as part of the Corporation Income Tax Act, plaintiff’s income, received from New Jersey payors, is derived from sources within New Jersey within the meaning of the statute, subject, of course, to defendant’s correct interpretation of the applicable constitutional standards.
Ill
The next issue, constitutional in nature, is whether the assessment, as plaintiff claims, is violative of due process.
A state may tax income generated in interstate commerce and satisfy due process requirements if there is (1) a “minimal connection,” or “nexus” between the interstate activities and the taxing state and (2) a rational relationship between the income attributed to the state and the intrastate values of the enterprise. Mobil Oil Corp. v. Comm’r. of Taxes of Vermont, 445 U.S. 425, 100 S.Ct. 1223, 1231, 63 L.Ed.2d 510 (1980); Moorman Manufacturing v. Bair, 437 U.S. 267, 272- 273, 98 S.Ct. 2340, 2343-2344, 57 L.Ed.2d 197 reh’g. den. 439 U.S. 885, 99 S.Ct. *606 233, 58 L.Ed.2d 201 (1978). Plaintiff asserts that the assessment here meets neither requirement.
The United States Supreme Court has stated that the nexus requirement is satisfied if:
... the taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits given by the state. The simple but controlling question is whether the state has given anything for which it can ask return. [Wisconsin v. J.C. Penney Co., 311 U.S. 435, 444, 61 S.Ct. 246, 250, 85 L.Ed. 267 (1940)].
Plaintiff contends that its contacts with New Jersey here are even more insubstantial than in those cases that have been held to violate due process, and concludes that New Jersey has given nothing to it for which it can ask a return. Plaintiff characterizes decisions of the United States Supreme Court as requiring some purposeful and deliberate availment of the protection of the taxing state's laws before a minimal connection justifying taxation will be found. Plaintiff particularly asserts that the entity sought to be taxed must employ property and personnel within the taxing state to generate income there.
Defendant, on the other hand, construes the relevant case law to conclude that the controlling consideration in United States Supreme Court decisions has been an economic presence in the state or the extension of benefits and protections, without which the foreign taxpayer could not take advantage of the consumer market of the taxing state.
Both parties principally rely on National Bellas Hess, Inc. v. Illinois Department of Revenue, 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967), which concerned the power of a state to require an out-of-state vendor to collect use taxes on mail order sales. The same due process principles are nevertheless applicable to the imposition of a corporate income tax. Id. at 756, 87 S.Ct. at 1391.
The taxpayer in National Bellas Hess was a mail order house, and did not maintain an office or any other place of business in the taxing state, Illinois. It did not have any employees or other agents either soliciting business or accepting payments there. It owned no real or personal property, had no telephone *607 listing, and did not advertise in newspapers or on radio or television in Illinois. Its contacts with the taxing state consisted of frequently mailing catalogues and flyers to customers or potential customers living in Illinois. Customers placed orders for merchandise by mail which were accepted by the taxpayer at its plant in another state. The merchandise was sent to the Illinois customer by mail or common carrier. The Court held that there was an insufficient nexus between the activities of the taxpayer and Illinois to justify the imposition of a duty to collect use taxes.
Plaintiff argues that its contacts with New Jersey are more tenuous than those of National Bellas Hess with Illinois. Like National Bellas Hess, it maintains no offices or employees in New Jersey; it neither owns nor leases any real or tangible personal property here; it states that it has no billboards or signs here;[12] it is not listed in any New Jersey telephone directory and does not advertise or mail advertising material here. Plaintiff particularly notes that it has never taken any action to solicit business in New Jersey.
Plaintiff states that National Bellas Hess confirmed the earlier result in Miller Brothers Co. v. Maryland, 347 U.S. 340, 74 S.Ct. 535, 98 L.Ed. 744, reh’g. den. 347 U.S. 964, 74 S.Ct. 708, 98 L.Ed. 1106 (1954), also involving a duty to collect use taxes. In Miller Brothers Co., a Delaware vendor advertised through Delaware newspapers and radio stations which reached Maryland inhabitants. It also mailed advertising circulars to former customers living in Maryland. While purchases could be made only at the vendor’s store in Delaware, the vendor made deliveries to Maryland both by common carrier and by means of its own vehicles. These activities, too, were found to be insufficient to justify the burden of collecting Maryland’s use tax.
*608 Plaintiff finally cites Brown-Forman Distillers, Corp. v. Collector of Revenue, 234 La. 651, 101 So.2d 70 (Sup.Ct.1958), cert. den. 359 U.S. 28, 79 S.Ct. 602, 3 L.Ed.2d 625 (1959), upholding a state income tax on a corporation whose only local activity was the presence of “missionary men” who called on wholesale dealers and occasionally assisted the wholesalers in displaying the taxpayer’s merchandise at retail stores.[13] This case, however, involved a challenge to the constitutionality of the tax on commerce clause rather than due process grounds. The Louisiana court found the magnitude of local operations had no bearing on the commerce clause issue. Id. 101 So.2d at 72. But see Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 LEd.2d 326, reh’g den. 430 U.S. 976, 97 S.Ct. 1669, 52 L.Ed.2d 371 (1977).
Defendant views the relevant decisional law as requiring some economic presence in the taxing state coupled with an exploitation of the local market, that will sustain taxation against a due process challenge. Defendant cites Northwestern States Portland Cement Co. v. Minnesota, 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed. 2d 421 (1959), which held that a state’s net income tax on a foreign corporation whose activities in the taxing state consisted of solicitation of orders by local employees based in a leased office in the taxing state comported with due process. Defendant argues, however, that the presence or activity constituting a sufficient nexus need not be as direct and definite as a local business office within the state.
In Scripto, Inc. v. Carson, 362 U.S. 207, 80 S.Ct. 619, 4 L.Ed.2d 660 (1960), for example, the Court sustained Florida’s imposition of a use tax liability against a foreign corporation that had failed to collect the tax from its Florida customers. The taxpayer’s only contact with Florida was its contractual relations with local wholesalers or jobbers who solicited orders for the taxpayer on a commission basis. The orders were forwarded out-of-state *609 for acceptance and the goods were shipped directly from the taxpayer’s home office to the Florida purchasers.
Defendant primarily relies, though, on the dissent in National Bellas Hess, Inc. v. Illinois Department of Revenue, supra, which noted that the case had been tried on affidavits which were uninformative as to the details of the taxpayer’s credit operations, including any collection activities,[14] but pointed out that the taxpayer’s catalogue described several credit arrangements. Justice Fortas, writing for the minority, would have held that:
. .. this large-scale, systematic, continuous solicitation and exploitation of the Illinois consumer market is a sufficient “nexus” to require Bellas Hess to collect from Illinois customers and to remit the use tax, especially when coupled with the use of the credit resources of residents of Illinois, dependant as that mechanism is upon the state’s banking and credit institutions. Bellas Hess is not simply using the facilities of interstate commerce to serve customers in Illinois. It is regularly and continuously engaged in “exploitation of the consumer market” of Illinois ... by soliciting residents of Illinois who live and work there and have homes and banking connections there and who, absent the solicitation of Bellas Hess, might buy locally and pay sales tax to support their state, [citation omitted] [386 U.S. at 761-762, 87 S.Ct. at 1394 (Portas, J., dissenting) ].
Defendant suggests that the result in National Bellas Hess would have been different had the court been supplied with more information about the taxpayer’s credit activities.
Finally, defendant cites Standard Pressed Steel Co. v. Washington Department of Revenue, 419 U.S. 560, 95 S.Ct. 706, 42 L.Ed.2d 719 (1975), involving a gross receipts tax on the sales of a foreign corporation to its customer in the taxing state. The corporation had one fulltime employee in the taxing state, whose job was to consult with the taxpayer’s customer regarding anticipated needs and requirements for the taxpayer’s product, and to follow up any difficulties that might occur with the product after delivery. The employee maintained his office at home, but his answering service was paid for by his employer. Orders and payments were sent directly by the customer to the *610 out-of-state offices of the corporation. Orders were shipped directly to the customer by common carrier. The employee was regularly assisted by a group of the taxpayer’s engineers, who visited the customer about three days every six weeks. In dispensing with the taxpayer’s argument that its local activities were thin and insubstantial, the Court stated that the regular employee “made possible the realization and continuance of valuable contractual relations” between the taxpayer and its customer. Id. at 562, 95 S.Ct. at 708.
From these cases, defendant insists that the relationship between New Jersey’s economy and plaintiff is substantial enough to support the tax in question, and asserts that state court decisions confirm his interpretation. Indeed, American Refrigerator Transit Co. v. State Tax Commission, 238 Or. 340, 395 P.2d 127 (Sup.Ct.1964), appears to extend the concept of nexus beyond that envisioned by the United States Supreme Court, despite the Oregon Supreme Court’s statement that:
We would expect the United States Supreme Court to hold, as we do, that due process nexus is established even though the taxpayer has no offices or agents within the taxing state if it could be shown that Oregon’s economy was a substantial economic factor in the production of the taxpayer’s income subject to tax. [395 P.2d at 132].
In American Refrigerator Transit Co., the Oregon court sustained the imposition of a corporate income tax on a company engaged in leasing refrigerator cars to operating railroads. The company did not lease to railroads operating in Oregon, but some of its cars were interchanged onto railroads operating in the state. The taxpayer had no control over the interchange of its cars, but did pay an Oregon property tax on its cars in Oregon. It had no other property, maintained no place of business and had no employees in Oregon.
The court decided that it was not necessary for the taxpayer to engage in some form of physical activity within the state in furtherance of a business purpose.
The connection between the taxing state and the out-of-state taxpayer necessary to establish nexus is essentially an economic rather than a physical relationship .... The nexus exists whenever the corporation takes advantage of the economic milieu within the state to realize a profit. [Id. 395 P.2d at 130].
*611 See also Equitable Savings and Loan Association v. State Tax Comm’n., 251 Or. 70, 444 P.2d 916 (Sup.Ct.1968), which, based upon the reasoning in American Refrigerator Transit Co., held that a local taxpayer which had loans in other states secured by out-of-state property from which it derived income, was entitled to apportion its income for Oregon income tax purposes.
The Oregon Court’s determination of what properly constitutes nexus seems to go beyond what even the dissenters in National Bellas Hess would have held subject to taxation. There, it was the “large-scale, systematic, continuous solicitation and exploitation” of the market, coupled with the presumed use of Illinois credit facilities that the dissenting opinion thought served as a sufficient connection with the taxing state. 386 U.S. at 761-762, 87 S.Ct. at 1393-1394 (Fortas, J. dissenting). This is substantially different than taking advantage of an “economic milieu.” It is even more doubtful whether the majority in National Bellas Hess would agree with the holding of the Oregon Court.
Other state cases cited by defendant do not go as far as American Refrigerator Transit Co. In Clairol, Inc. v. Kingsley, 109 N.J.Super. 22, 262 A.2d 213 (App.Div.), aff’d. 57 N.J. 199, 270 A.2d 702 (1970), cert. denied 402 U.S. 902, 91 S.Ct. 1377, 28 L.Ed.2d 643 (1970), the court sustained the imposition of the corporation business tax, N.J.S.A. 54:10A-1 et seq., upon a corporation owning and employing property in New Jersey, and whose employees solicited orders and promoted the corporation’s products here. In Columbia Bank for Cooperatives v. Blackmon, 232 Ga. 344, 206 S.E.2d 424 (Sup.Ct.1974), a nonresident bank was found to be subject to an intangible personal property tax on long-term notes secured by real estate in the taxing state. Significantly, the court determined that the taxpayer did some solicitation of loans in the state, that the bank’s employees visited the state on numerous occasions, furnishing information to potential borrowers about the bank’s loan policies, as well as inspecting the realty to be used as security. The loans were closed in the taxing state, and the loan agreements were executed by the debtor there.
*612 Plaintiff on the other hand, has no employees here, it employs no property here, and does no solicitation here. Its direct loan to Goodrich Realty and all of its participation agreements were executed and closed in New York. Interest and other payments were sent to plaintiff’s New York offices. Accordingly, neither Clairol, Inc. v. Kingsley, supra, nor Columbia Bank for Cooperatives v. Blackmon, supra, supports defendant’s position as to plaintiff’s taxability.
The United States Supreme Court would seem to require more than plaintiff’s economic presence here or the taking advantage of New Jersey’s economic milieu to sustain the tax at issue. It appears that, in addition, there must be a degree of physical presence. See, e.g., National Geographic v. Cal. Equalization Bd., 430 U.S. 551, 560 n. 6, 97 S.Ct. 1386, 1392, n. 6, 51 L.Ed.2d 631 (1977) (the State of California conceded that absent the taxpayer’s two offices in the taxing state, the court would have to have made a finding of insufficient nexus based on National Bellas Hess v. Illinois Dept. of Taxation, supra); Standard Pressed Steel Co. v. Washington Rev. Dept., supra (nexus determined to exist based upon maintenance in the taxing state of a single employee in a home office); Scripto, Inc. v. Carson, supra (nexus determined to exist based on maintenance of 10 salesmen conducting continuous local solicitation in the taxing state); General Trading Co. v. Tax Commissioner, 322 U.S. 335, 64 S.Ct. 1028, 88 L.Ed. 1309 (1944) (nexus found based on out-of-state sales arranged by seller’s local agents working in the taxing state); Nelson v. Sears Roebuck & Co., 312 U.S. 359, 61 S.Ct. 586, 85 L.Ed. 888 (1941) (nexus determined to exist based on maintenance in the taxing state of local retail store outlets by out-of-state mail order sellers); Clairol, Inc. v. Kingsley, supra (nexus based on substantial physical presence in the taxing state by taxpayer’s representatives).
In National Bellas Hess, Inc. v. Illinois Department of Taxation, supra, the taxpayer, with its substantial Illinois sales, had a definite economic presence in the taxing state. Its continuous and large-scale mail solicitation was intended to take advantage of Illinois’ economic milieu. The Court nevertheless held that *613 there was not a sufficient relationship between the taxpayer’s activities and Illinois to support a duty to collect use tax.
Scripto Inc. v. Carson, supra, substantiates defendant’s claim that due process does not require a local business office within the state. And while it is not necessary for a local employee to solicit business, provided the employee makes possible the realization and continuance of the relations producing the taxpayer’s income, Standard Pressed Steel Co. v. Washington Department of Revenue, supra, it would still appear, however, that plaintiff’s connections with New Jersey are not substantial enough to constitute nexus.
The recording of the security interests in New Jersey realty, taken by itself, cannot realistically be said to provide plaintiff with a protection, opportunity, or benefit until plaintiff actually seeks to enforce its rights. Plaintiff has presumably paid a fee for the privilege of recording. New Jersey does not protect plaintiff until a borrower defaults, and all other remedies including the enforcement of the obligation on the borrower’s note, fail.[15] Until 'such time as there is a default, plaintiff continues to receive its income. At oral argument, plaintiff conceded that it would be liable for the tax were it forced to foreclose and become the owner of any of the mortgaged properties. Cf. Avco Fin. Services, etc. v. Taxation Div. Director, 4 N.J.Tax 349 (Tax Ct.1982) in which the taxpayer, a consumer lender, filed in New Jersey UCC-T financing statements for consumer goods and household effects, and also took security interests in automobiles registered here (which interest was noted on certificates of title) and filed with the New Jersey Division of Motor Vehicles. Id. at 354. The taxpayer in Avco also retained New Jersey attorneys to initiate collection actions in New Jersey courts. Ibid. These activities together with other limited connections were found insufficient to constitute a nexus justifying subjectivity to the corporation income tax.
*614 Additionally, in the case of the participation loans, the security interest was recorded by, and in the name of, the lead institution.[16] Plaintiff was not protected by the New Jersey recordings, but relied primarily on its unrecorded participation agreements with the lead institutions.
Defendant emphasizes plaintiff’s activities in connection with its participation in the Evesham project, which eventually, in 1976, resulted in the participants taking title to the property.[17] Defendant asserts that plaintiff’s involvement in efforts to save the project began in 1974, but the stipulations and other documents submitted indicate that these efforts began no earlier than late 1975. The tax year at issue here is 1974. Whether plaintiff’s activities at a later time would be sufficient to constitute nexus with this state is not relevant to this action. It should be noted that even in the case of the Evesham development, the participants did not resort to the use of the New Jersey courts, but took the deed in lieu of foreclosure.
If the recording of the security interests in the realty, taken by itself, is not a sufficient connection to satisfy due process, plaintiff had few other direct connections with this State that would justify the assessment. The occasional visits of its employees do not reach the level of activity by employees in Standard Pressed Steel Co. v. Washington Department of Revenue, supra, or Northwestern States Portland Cement Co. v. Minnesota, supra.
Only if plaintiff’s relationship to the lead institutions in the participation agreements amounted to an agency relationship could the required nexus exist. An examination of the facts shows that this was not the case.
*615 The lead banks were not engaged in a program of solicitation on plaintiff’s behalf. Cf. Scripto, Inc. v. Carson, supra. Plaintiff was itself solicited by the lead bank when the lead bank could not or would not finance the entire loan that was sought. Although not stated by either party, it is conceivable that the lead bank was not able to handle the entire transaction by itself, and looked to plaintiff for additional financing to make possible its own share of the transaction. Although defendant refers to plaintiff’s exploitation of the New Jersey market, plaintiff’s loan transactions might also be characterized as New Jersey borrowers taking advantage of a New York lender. This is not like the situation in National Bellas Hess v. Illinois Department of Revenue, supra, where the dissent observed that, without the activities of Hess, Illinois residents might shop locally and pay Illinois state sales tax. It is fairly clear that if New Jersey institutions were able to finance a profitable loan by themselves, they would have, rather than turning to plaintiff and sharing interest and other income.
Copies of participation agreements submitted to the court in connection with this action indicate that the lead institutions were substantially free to exercise or refrain from exercising all rights of loan enforcement prior to any default by the borrowers.[18] The role of the lead banks here is different in kind and degree from the role of local employees or contractors in the cases relied upon by defendant.
The referrals of loan business by the lead banks to plaintiff was neither systematic nor continuous. Of the six loans from which plaintiff received interest income in 1974, four were participations with three different New Jersey banks, one was a participation with Republic Mortgage Investors of Florida, and one was the direct loan to Goodrich Realty, initiated by the borrower. These transactions would seem to be more in the *616 nature of occasional, sporadic and random incidents, and not the systematic and continuous activities that existed in Standard Pressed Steel v. Washington Department of Revenue, supra; Scripto v. Carson, supra; Northwestern States Portland Cement Co. v. Minnesota, supra, or even in National Bellas Hess v. Illinois Department of Revenue, supra.
The only way in which plaintiff’s activities here can be regarded as continuous was its retention of an option, later exercised, to finance subsequent stages of the Arrow Properties development. This option was obtained at the outset, however, and was not a result of ongoing activities by plaintiff throughout the entire period of the participation. It was not a product of continuous solicitation, nor was it a result of the type of servicing activity performed by the taxpayer’s employee in Standard Pressed Steel.
In sum, plaintiff’s activities in New Jersey do not reach the level of the minimal connection with this State that will satisfy due process. Plaintiff’s loan evaluations took place in New York with the exception of a few visits by its employees to this State. Plaintiff received its payments in New York and made advances on the loans from its offices there. Plaintiff did not use the New Jersey courts, or become involved in any enforcement activity during the assessment year. While defendant points, in particular, to plaintiff’s high degree of control over the Goodrich Realty construction project, that control was exercised in New York. Again, plaintiff’s employees made occasional visits, and certain independent contractors made reports to plaintiff at its New York offices. Apart from the fact that the security interests were in plaintiff’s name, it does not appear that plaintiff’s contacts with New Jersey in connection with the Goodrich Realty loan were greater than those in connection with its participation agreements.
Accordingly, plaintiff did not, during 1974, have that “definite link, [or] minimum connection” with New Jersey to support the assessment made here. Miller Bros. Co. v. Maryland, supra, 347 U.S. at 345, 74 S.Ct. at 539.
*617 In light of this conclusion, consideration need not be given to plaintiff’s remaining constitutional claims. The Clerk of the Tax Court is directed to enter judgment invalidating defendant’s assessment.

It is not mentioned in the stipulations where one underlying loan, in which the lead institution was Republic Mortgage Investors of Coral Gables, Florida, was negotiated and executed.

It is not clear whether any of the underlying direct loans between lead banks and the mortgagors were contingent upon plaintiffs informal agreement to acquire a participation.

The loan agreement provided that no more than $6,000,000 could be outstanding at any time, so that the actual extent of plaintiffs participation was $3,000,000.

Although not stated, these figures presumably do not include the amounts received as commitment fees by plaintiff.

N.J.S.A. 54:10E-2 lists three circumstances, not relevant here, by reason of which a corporation will not be deemed to have income derived from sources within New Jersey.

In its brief, plaintiff quoted from a letter dated March 4, 1976. This letter was not included in the exhibits submitted by the parties. On the return day of the motions for summary judgment, oral argument was focused upon the April 16, 1975 letter.

This provision has been amended by L.1981, c. 27, § 11 to require 30 days’ notice.

As plaintiff notes, defendant’s brief devotes 27 pages to a discussion of the meaning of the statutory phrase.

In the case of a corporation whose income is derived from sources both within and without the state, the Corporation Income Tax Act uses a three-factor formula to determine the amount of income allocable to New Jersey. N.J.S.A. 54:10E-6. It is stipulated that plaintiff has no New Jersey property or payroll, two of the factors in the computation. The tax contested here results solely from defendant’s inclusion of plaintiffs interest and special fee income from loans secured by New Jersey real property in the numerator of the receipts portion of the allocation formula. If this income is not properly includable, plaintiff will not be subject to the tax, since the allocation factor will be zero.

Defendant asserts that certain exceptions enumerated in N.J.S.A. 54-.10E-2, by reason of which a foreign corporation will not be deemed to have income derived from sources within New Jersey, were intended to be exclusive. There is no indication that the income sources listed in N.J.S.A. 54:1 OE-2 were meant to be the only exceptions to taxability. The ultimate question is what did the Legislature intend to tax. See Resnick v. E. Brunswick Tp. Bd. of Ed., 77 N.J. 88, 99, 389 A.2d 944 (1978); Reilly v. Ozzard, 33 N.J. 529, 539, 166 A.2d 360 (1960).

The taxpayer in this case was clearly doing business in the taxing state, and presumably some of its income was subject to the tax. The opinion was limited to a consideration of whether the service charge income fell within the statute.

Plaintiff did retain the right to erect a sign in connection with its loan to Goodrich Realty; no evidence has been presented to inform the court whether such a sign was in fact erected at the construction site.

Plaintiff notes that the result in Brown-Forman was overruled with the enactment by Congress of Pub.L. No. 86-272, 73 Stat. 555 (1959), 15 U.S.C.A. § 381.

The dissenting opinion observed that, even accepting the company’s statement that it had brought no suits in Illinois, it was unreasonable to assume that the company did not sell, assign or take other measures to collect delinquent accounts. 386 U.S. at 762, 87 S.Ct. at 1394.

AS plaintiff points out, it may sue on the note anywhere it can find the borrower, and is not necessarily confined to New Jersey courts in such an action.

In only one transaction, the participation with Republic Mortgage Investors, were both the mortgage and the participation agreement recorded.

The property was deeded to the lead bank, Midlantic, but a memorandum of the participation agreement designating the participants as tenants in common was also recorded.

Lead institutions, however, were required by the participation agreements to notify plaintiff in the event of default, upon which the lead bank had to obtain plaintiff’s written consent before exercising or refraining from exercising any rights of enforcement under the loan documents.