[Nos. 46930–3, 47305–6.   En Banc.   September 17, 1981.]

THE DEPARTMENT OF REVENUE, *Appellant,* v. J. C. PENNEY COMPANY, INC., *Respondent.*

J. C. PENNEY COMPANY, INC., *Respondent,* v. THE CITY OF TACOMA, *Appellant.*

*Kenneth O. Eikenberry, Attorney General,* and *William B. Collins, Assistant,* for appellant State.

*Robert R. Hamilton, F. H. Chapin, Jr.,* and *Thomas L. Dempsey,* for appellant City of Tacoma.

*Davis, Wright, Todd, Riese & Jones,* by *C. James Judson* and *Neil H. Schickner,* for respondent.

*John T. Piper* and *James H. Lowe,* amici curiae for respondents.

DORE, J.—The critical facts are not in dispute in these consolidated cases. J. C. Penney Company, Inc. (Penney) operates over 50 retail stores in Washington, including one in Tacoma. A Penney customer who wishes to obtain a

charge card may fill out a "Credit Agreement" application, obtained at a local store or in a Penney catalog. The completed application may be mailed directly to Penney's regional credit office in Portland, Oregon (Portland office), or returned to the local store (which forwards one copy to the Portland office and another copy to a Washington credit bureau designated by the Portland office), or, in the case of a catalog application, sent directly to the catalog center in Wisconsin. Local stores are staffed with credit–layaway associates who answer questions about the application and otherwise aid in the filling out of the application. Local store employees are encouraged to solicit credit card applications which, the record discloses, boosts retail sales. The Portland office determines, after receiving the credit history of the applicant from the Washington credit bureau, whether the applicant will receive a charge card. If the application is approved, the Portland office establishes the customer's credit limit. The Credit Agreement is governed by Washington law.

When a Penney's charge card is offered for payment at a local store, the cashier will check for authorization through a computer terminal which is linked to the Portland office computer. If the computer refuses the purchase, the customer is directed to the credit–layaway associate who calls the Portland office and provides updated credit information, if any, supplied by the customer. The Portland office determines whether to authorize the purchase and relays this decision to the credit–layaway associate who informs the waiting customer.

A charge card holder receives a monthly statement indicating the purchases made during the prior billing period. The customer may pay the amount owed in full or may pay in monthly installments. If the latter is elected, a service charge will be assessed on the deferred balance. The billing on credit card accounts is handled through the Portland office, including assessment of the service charge. The monthly statements are mailed directly to the customer; a return envelope to the Portland office is supplied. Custo-

mers may, alternatively, deliver their payments to the local store.

If a customer fails to pay the bill, the Portland office directly contacts the customer by mail or telephone. Delinquent accounts are referred to a Washington collection agency selected by the Portland office. If necessary, the collection agency may hire attorneys who litigate in the Washington courts.

The Washington State Department of Revenue (Department) imposed a business and occupation tax (B & O tax), set out at RCW 82.04.290[1] on Penney for the period 1966 through 1974 seeking to tax service charge income received by Penney on credit sales to Washington residents. Penney protested. The Board of Tax Appeals (Board) reversed the Department, holding Penney's activities outside the reach of that tax. The Board also held that the assessment violated the due process and commerce clauses of the United States Constitution. The Superior Court for Thurston County affirmed the Board. This appeal followed.

The City of Tacoma (Tacoma) assessed its B & O tax, Tacoma Municipal Code 6.68.220(i)[2] on Penney's service

---

[1]RCW 82.04.290 reads:

"Upon every person engaging within this state in any business activity other than or in addition to those enumerated in RCW 82.04.230, 82.04.240, 82.04.250, 82.04.255, 82.04.260, 82.04.270, 82.04.275 and 82.04.280; as to such persons the amount of tax on account of such activities shall be equal to the gross income of the business multiplied by the rate of one percent. This section includes, among others, and without limiting the scope hereof (whether or not title to materials used in the performance of such business passes to another by accession, confusion or other than by outright sale), persons engaged in the business of rendering any type of service which does not constitute a 'sale at retail' or a 'sale at whole-sale.'"

[2]Section 6.68.220(i) reads:

"Upon every person engaging within this city in any business activity other than or in addition to those enumerated in subsections (a), (b), (c), (d), (e), (f), (g), and (h) above, the amount of tax on account of such activities shall be equal to the gross income of the business multiplied by the rate of one–half of one percent (.005). This subsection includes, among others, and without limiting the scope thereof (whether or not title to material used in the performance of such business passes to another by accession, confusion or other than outright sale),

charge income generated from January 1972 through September 1977 on activity at Penney's Tacoma store. Penney brought suit to recover the tax paid. The Superior Court for Pierce County granted Penney's motion for summary judgment directing Tacoma to refund the tax and enjoining further assessment. This appeal followed.

We reverse the courts below, reinstate the imposition of the taxes, and remand to the lower courts for a determination of the proper apportionment formula.

■ The B & O tax in question[3] was designed to tax all business activities within the state which have not otherwise been taxed. The State imposed its B & O tax upon Penney's income derived from finance charges. Penney argues that its finance charge income is beyond the ken of the tax because all activities relating to Penney's imposition of the finance charge take place in Oregon. The State concedes it has no authority to tax income earned outside of Washington; however, it contends that Penney's activities in this state give rise to the finance charge. The parties agree as to the specific services which are provided by the local Penney stores as well as those provided through the Oregon office. Thus, a single question is posed: Which activities of Penney's give rise to the finance charge? Our answer is that all of Penney's activities relating to the sale on credit give rise to the finance charge. Some of these activities are subject to the Washington tax at issue, others are not. We elaborate below.

■ In order to be subject to the tax in question, Penney must, within Washington, engage in some business activity, including rendering a service, other than a sale at retail. The servicing of installment (credit) accounts was held to

---

persons engaged in the business of rendering any type of service."

[3]RCW 82.04.290 and the Tacoma Municipal Code 6.68.220(i) are substantially identical in their language and intent. *See* footnotes 1 and 2. For convenience sake, we will refer to the State tax imposed through RCW 82.04.290 in this opinion. The analysis and discussion of that tax, however, should be applied to the Tacoma tax as well.

be such a business activity in *Rena–Ware Distribs., Inc. v. State,* 77 Wn.2d 514, 463 P.2d 622 (1970), and the resulting service charge income was taxable under RCW 82.04.290. Penney views the subject cases as the "flip side" of *Rena–Ware.* We do not agree.

In *Rena–Ware,* door–to–door salesmen offered goods for sale to out–of–state persons. At the time of purchase, the buyer had the choice of paying in cash or establishing a credit account, thereby accruing a service charge. All activities relating to the credit sale—credit approval, bookkeeping and billing—were performed in Rena–Ware's home office in Washington. In discussing whether or not these local activities were taxable, the court noted that it was legislative intent, as expressed in RCW 82.04.220, to tax all business activity not yet subjected to a B & O tax. The servicing of credit accounts was a business activity which the taxpayer engaged in locally; it gave rise to a finance charge which was income; this income was not otherwise taxed.

> The business activity of servicing installment accounts falls naturally within this definition, and it is our conclusion that the legislature intended that this activity should be taxed under this section . . .

*Rena–Ware,* at 517. Thus, *Rena–Ware* distinguished the cash sale from the credit sale.

> When cash is not paid for a purchase, a service charge, designated as such, is added to the purchase price. The service charge is the same, regardless of the amount of the unpaid balance.

*Rena–Ware,* at 515. If a sale is made on credit, the *income derived from the service charge* is taxable. The business activities which give rise to that service charge are those activities relating to the privilege of making the purchase on credit. Although, in *Rena–Ware,* some of these activities took place out of state, there were sufficient ties with Washington to subject the service charge income to the B & O tax.

In accordance with the holding in *Rena–Ware,* we must, first, acknowledge that the servicing of Penney's credit

accounts is taxable activity; second, identify the activities relating to sales for credit, rather than sales made for cash; and, third, identify the situs of those activities as within or without Washington.

▇ As described above, the activities relating to the credit sales which occur outside of Washington are generally those involving credit approval, billing and bookkeeping. The parties agree that the following credit sales activities occur in Washington:

1. 100 percent of the retail credit sales underlying the finance charges were made at Washington stores.
2. Employees of Penney's at the Washington stores assisted customers in applying for credit privileges.
3. The Portland credit office's provisional decision to *not* authorize a credit sale may be reversed (by Portland personnel) after an employee in the Washington store telephones Portland with additional credit information.
4. Washington Penney stores receive payments from customers on credit accounts (although the great majority of customers send such payments directly to Portland).
5. Washington companies are hired to collect delinquent accounts.
6. Washington laws concerning consumer protection and usury apply to the underlying credit sale and imposition of the finance charge.
7. Washington courts are being used to settle disputes.

It is the credit sale which places Penney in the position of potentially receiving a finance charge. The local activities which promote the sale on credit are sufficient to bring the finance charge income within the taxing statute. If all purchasers who buy on credit pay their accounts within 30 days and thereby avoid incurring a finance charge, then the *measure* of tax will be zero. The credit sale is the triggering business activity; the imposition of Penney's finance charge is the measuring device by which the State can assess its B & O tax. All activities which establish credit status for customers, as well as the credit sale itself and those services provided to customers in the Portland office, are business activities which give rise to the finance charge. *Rena–Ware*

did not discuss the type of credit arrangement that is before the court in the subject case. It is the local activities which must be assessed in light of the taxpayer's entire operation and business presence in the state. A traveling salesman selling cookware is hardly in the same retailers' league as is Penney. What served in *Rena–Ware* as local activities which subjected the finance charge income to the B & O tax does not preclude different local activities from serving the same purpose. Penney's presence in Washington cannot be compared to a single door–to–door salesman traveling from one town to another. Those accounting methods used by the seller in *Rena–Ware* are not necessarily the *only* activities which give rise to a finance charge in every case.

The West Virginia Supreme Court has held, on substantially identical facts,[4] that Penney's finance charge income was the result of credit activity which took place in West Virginia, notwithstanding the fact that the credit approval, billing and bookkeeping relating to the finance charge occurred outside of that state. *J.C. Penney Co. v. Hardesty,* 264 S.E.2d 604 (W. Va. 1979). It held that the finance charge income was taxable under a West Virginia statute described as a

> business and occupation tax imposed on income from finance charges . . . levied upon a service business not

---

[4] "Here, the factual focus is on the activities surrounding Penney's extension of credit and collection of credit finance charges from State customers who do not elect to pay their account in full within thirty days from the date of the sale. It does not appear to be disputed that applications for a Penney's credit card, which forms the basis for a credit sale, can be obtained at the local stores.

"Although Penney's main West Virginia credit office is located in Greentree, Pennsylvania, it relies on credit investigations by West Virginia agencies. Credit sales are made at local stores, which can also receive credit payments, although most payments are made directly to the Greentree office, which sends the bills. The local store does make adjustment for the return of merchandise received on credit. West Virginia collection agencies and its court system are employed by Penney in its collection of delinquent accounts. Finally, the credit sales are subject to West Virginia usury and consumer protection laws. These factors constitute substantial contacts sufficient to justify the imposition of the tax." *J.C. Penney Co. v. Hardesty,* 264 S.E.2d 604, 618 (W. Va. 1979) (Miller, J., concurring).

otherwise specifically taxed.

*Hardesty,* at 618 (Miller, J., concurring). Penney attempts to distinguish *Hardesty* because that case was decided upon constitutional grounds, whereas the subject case involves statutory construction. This so–called distinction begs the very question before both courts. It is true that the analysis in *Hardesty* turns on whether the tax imposed is constitutionally permissible; however, one does not reach the constitutional question without the initial determination that the imposition of the West Virginia tax on Penney's finance charge income was proper. The credit activities which occurred in West Virginia were sufficient to give rise to that finance charge. The fact that the mechanical imposition of the service charge occurred outside of West Virginia did not sway that Supreme Court. It similarly has not influenced us.

*Department of State Revenue v. J.C. Penney Co.,* ___ Ind. App. ___, 412 N.E.2d 1246 (1980), also relied on by Penney, is distinguishable. Penney is a nonresident of Indiana; the service charge income is considered an intangible in Indiana. The presumption (as reflected in the Department of Revenue's regulations, *see Department of State Revenue v. J.C. Penney Co., supra* at 1251–52) that income of a nonresident received from intangibles is *not* taxable under the gross income tax. In order to rebut this, it must be shown that such intangible obtained legal situs within Indiana by being an integral part of the in–state business. The Indiana court concluded that the generation of service charges did not meet this test. In other words, the legal situs of the intangible remained out of state and not subject to tax.

The Indiana Court of Appeals held that

the facts in this case support the trial court's conclusion that *Penney's local credit service activities* were remote and minimal in comparison to the overall interstate character of the transaction.

(Italics ours.) *Department of State Revenue v. J.C. Penney Co., supra* at 1252. In describing the state law on activity

considered integral to a business, the court quoted from *Department of State Revenue v. Convenient Indus. of America, Inc.,* 157 Ind. App. 179, 299 N.E.2d 641, 647 (1973) as follows, in part:

> "Here, the *minimal activities* taking place within the State of Indiana with respect to the 'service fee' . . . and with respect to the 'advertising fee' . . . attributable to only a fractional portion of the fee, fall far short of the *degree of activity contemplated by the Indiana Gross Income Tax.*"

(Italics ours.) *Department of State Revenue v. J.C. Penney Co., supra* at 1251. As explained earlier, the Washington legislature, through RCW 82.04.290, intended to catch *all* business activity not yet taxed. The *degree of activity* is what the Indiana court balanced. The question in Washington is whether there is *any business activity at all;* if interstate in nature, the proper apportionment will be made. We cannot construe the facts before us to support a finding that Penney does not engage in any business activity in Washington which gives rise to a finance charge. Reliance on the Indiana court's conclusion, that insufficient activity was shown to subject the income to that tax, is, therefore, misplaced.

There is no doubt but that Penney engages in interstate commerce. Because we are upholding the imposition of this tax, the question of the alleged violation of the due process and commerce clauses of the United States Constitution must be reached.

■ The due process clause requires that there be a nexus between the taxing state and the activity sought to be taxed. *Mobil Oil Corp. v. Commissioner of Taxes,* 445 U.S. 425, 63 L. Ed. 2d 510, 100 S. Ct. 1223 (1980). If the local activities are dissociated from the business activity which is the subject of the tax, then the local tax cannot stand. *Norton Co. v. Department of Revenue,* 340 U.S. 534, 95 L. Ed. 517, 71 S. Ct. 377 (1951). As demonstrated above, the imposition of the finance charge involves a great deal of Washington activity relating to establishing credit accounts

and handling local problems relating to that credit account. These in-state activities of Penney are not sufficiently dissociated from its finance charge income to violate the due process clause.

The due process clause also requires that there be a relationship between the income attributable to the State and the intrastate values of the enterprise. The question here is one of apportionment. The State concedes that apportionment is proper. When properly apportioned, the tax will not offend the due process clause.

█ The commerce clause will not be violated if a state tax which falls on interstate commerce is "designed to make the commerce bear a fair share of the cost of the local government whose protection it enjoys". *National Bellas Hess, Inc. v. Department of Revenue,* 386 U.S. 753, 18 L. Ed. 2d 505, 87 S. Ct. 1389 (1967). Once again, the question is one of apportionment. As stated above, appellants concede that apportionment is required because some of the activity relating to the finance charge takes place outside of Washington.

█ There is an allegation that impermissible multiple taxation will result if the Washington tax is upheld, because Penney's service charge income may be taxed by Oregon. The burden is on the taxpayer to show that it is the victim of multiple taxation. The taxpayer has not met this burden; absent the mere assertion that Oregon "may" impose such a tax, there is nothing in the record to support such a claim. In any event, if a multiple tax is shown, the local tax need not fail; rather, apportionment can cure the defect. *Department of Revenue v. Association of Wash. Stevedoring Cos.,* 435 U.S. 734, 55 L. Ed. 2d 682, 98 S. Ct. 1388 (1978).

The lower courts are reversed and the causes remanded for a determination of the proper apportionment formula, the assessment of taxes, and entry of judgment in accordance with the provisions of this opinion.

ROSELLINI, STAFFORD, UTTER, HICKS, WILLIAMS, and DIMMICK, JJ., concur.

DOLLIVER, J. (dissenting)—All parties to this case, as well as the majority, rely to some extent on *Rena–Ware Distribs., Inc. v. State,* 77 Wn.2d 514, 463 P.2d 622 (1970), which also involved the application of RCW 82.04.290. In contrast to the majority, I believe the principles enunciated in that case require the court to find for Penney. An extensive analysis of the facts and holding in *Rena–Ware* is necessary in order to understand its applicability.

Rena–Ware sold cookware through the use of door–to–door salespeople. Sales were made from approximately 30 district sales offices, including 2 in Washington, but all orders were received and processed at the home office in Opportunity, Washington. Deliveries were made from warehouses in a number of states. Rena–Ware did not manufacture the products but purchased them from various manufacturers. When a customer did not pay cash, a service charge, designated as such, was added to the purchase price. The service charge was the same regardless of the amount of the unpaid balance.

The Department of Revenue assessed the business and occupation tax upon the receipts from the service charge on the theory that the servicing of accounts is a business handled entirely within the state and that a tax upon it is not a burden on interstate commerce. Rena–Ware challenged the tax. It argued that the extension of credit and the servicing of credit accounts were inseparable components of the underlying sales transactions and therefore, since the sales were out of state, they were beyond the taxing authority of the State. The State, however, argued that the servicing of credit accounts is a distinct business separate and apart from the business of making sales at retail.

The court held (1) Rena–Ware's extension of credit and servicing of credit accounts producing service charge income constituted a distinct business separate and apart from the underlying retail sales transactions; and (2) Rena–Ware was engaged in this business within the State of

Washington so as to subject it to the business and occupa-
tion tax under RCW 82.04.290. The court stated:

> As the [State] points out, [Rena–Ware's] activities for
> which the service charge is made are not expressly cov-
> ered in any section of the taxing act, nor are they
> expressly excluded. Since it was the intent of the legisla-
> ture, set forth in RCW 82.04.220, to tax all business
> activities not expressly excluded, it is reasonable to con-
> clude that the legislature intended to include this activity
> in the catch–all provision, RCW 82.04.290.

> We are of the opinion that the Department of Revenue
> has correctly construed RCW 82.04.290, which levies a
> tax on "every person engaging within this state in any
> business activity . . . [including] the business of render-
> ing any type of service which does not constitute a 'sale
> at retail' . . ." The business activity of servicing install-
> ment accounts falls naturally within this definition, and
> it is our conclusion that the legislature intended that this
> activity should be taxed under this section rather than
> under RCW 82.04.250, taxing retail sales. This interpre-
> tation not only gives effect to the legislative intent evi-
> denced in the taxing statutes, but harmonizes them with
> RCW 63.14.040, which regulates installment sales and
> requires that service charges be separately stated. The
> legislative approach to the problems dealt with in that
> statute indicates an awareness on the part of the mem-
> bers of that body that service charges on installment
> sales are not in fact a part of the purchase price.

> The Department of Revenue has also levied a tax upon
> income which the appellant derives from management
> services which it renders to its wholly–owned Canadian
> and Washington subsidiaries. The appellant contends
> that this tax is improper since the officers and directors
> and the sales manager of the three companies are the
> same. In brief, the appellant would have us "lift the cor-
> porate veil" and observe that in fact there is only one
> corporation.

> If this case involved a fraud upon third persons, of
> course, the court would not permit the appellant to
> escape liability by means of the corporate structures
> which it employs. But we are not here concerned with
> such a case. The appellant has chosen to employ these
> structures for its own reasons, and we assume that it
> finds them advantageous. For purposes of the taxing

statutes, they are separate entities. Mere common ownership of stock, the same officers, employees, etc., does not justify disregarding the separate corporate identities unless a fraud is being worked upon a third person. *See Associated Oil Co. v. Seiberling Rubber Co.*, 172 Wash. 204, 19 P.2d 940 (1933).

In *Washington Sav–Mor Oil Co. v. Tax Comm'n*, 58 Wn.2d 518, 523, 364 P.2d 440 (1961), the plaintiff sought to avoid business and occupation taxes imposed under RCW 82.04, upon the ground that it was making sales to a wholly–owned subsidiary corporation. We said:

> The appellant asks us to disregard its separate existence, not in order to prevent fraud or injustice, but in order to gain an advantage. This we cannot do. The legislature has not seen fit to exclude transactions between affiliated corporations, and we find in the facts of this case nothing which would justify the judicial engrafting of such an exclusion upon the statute.

In that case, the parent was selling goods to its subsidiary. Here the appellant is selling its services. There is no other significant distinction between the cases. What we said there is applicable here. The appellant is rendering valuable services to its subsidiary and is receiving remuneration for them. This activity is taxable under the statutes. The trial court correctly sustained the Department of Revenue's ruling on this matter.

*Rena–Ware*, at 517–18.

The principles to be derived. from *Rena–Ware* are: (1) Service charge income received in exchange for the extension of the privilege of paying for goods over a time period represents income from the "business activity" of servicing credit accounts, which constitutes a distinct business separate and apart from the underlying retail sale transactions giving rise to the credit account; and (2) This "business activity" is engaged in where the processing, maintaining and record–keeping functions incidental to the servicing of the credit card accounts are performed.

Again, in contrast to the majority, I agree with the assertion of Penney that the situation in this case is a mirror image to that in *Rena–Ware*. In *Rena–Ware*, as here, authority and responsibility for the servicing of credit accounts was separated from that of retail sales. In *Rena–*

*Ware,* the company maintained warehouses and district sales offices in numerous states and cities in support of its retail sales operations while all essential credit account servicing functions were performed in the home office in Washington. In this case, Penney operates retail sale outlets in Tacoma and other parts of Washington while all essential credit account servicing functions are performed in Portland, Oregon. In *Rena–Ware,* the taxpayer's primary business was the generation of retail sales. The deferred balance credit accounts of Rena–Ware arising from retail credit sales were controlled by the regional credit office responsible for servicing credit accounts. The same is true here.

In terms of factual distinctions between the two cases, this case provides even greater support for application of the principles enunciated in *Rena–Ware.* In *Rena–Ware* there was a direct link between the consummation of the retail sale and the generation of service charge income. The sale was consummated only when the order and application for credit were submitted by the customer in the customer's own state and then approved by the Rena–Ware office in Washington. Upon approval, a finance charge was immediately assessed. Despite this direct link between the retail sale and the generation of service charge income, the court ruled that Rena–Ware's credit account servicing activities constituted a distinct business, separate and apart from its retail sales activities. Furthermore, despite the direct link between the salesperson's contact with the out–of–state customer which led to a retail credit sale and the automatic assessment of a service charge, the court ruled that no part of the activities encompassed within Rena–Ware's service charge "business" was carried on outside the state.

Here, in contrast, there was no such direct link between the consummation of a retail sale and the generation of finance charge income. When the Portland credit office approved a credit card sale in a Washington outlet, that act in itself did not give rise to any finance charge since the purchaser could avoid these charges by paying the purchase price in full when it was billed. Finance charge income was

generated only when, after the retail sale was consummated and after the customer received the bill, the customer chose to defer payment of the purchase to a subsequent billing period.

Thus, unlike *Rena–Ware* where each retail credit sale automatically gave rise to service charge income, in this case the generation of finance charge income was completely divorced from the underlying retail credit sales. When a Penney credit card holder decided to defer payment for a credit sale to a subsequent billing period, the customer was in effect deciding to borrow the unpaid balance from Penney at a specific interest rate. Penney's finance charge income was thus derived solely from the independent decisions of its credit card holders as to the method of financing their credit purchases after their initial billing.

To justify the imposition of the tax, the majority states at page 44:

> It is the credit sale which places Penney in the position of potentially receiving a finance charge. The local activities which promote the sale on credit are sufficient to bring the finance charge income within the taxing statute. If all purchasers who buy on credit pay their accounts within 30 days and thereby avoid incurring a finance charge, then the *measure* of tax will be zero. The credit sale is the triggering business activity; the imposition of Penney's finance charge is the measuring device by which the State can assess its B & O tax. All activities which establish credit status for customers, as well as the credit sale itself and those services provided to customers in the Portland office, are business activities which give rise to the finance charge.

This is, of course, exactly the same argument used by Rena–Ware: that the extension of credit ("the local activities which promote the sale on credit") and the servicing of credit accounts ("the imposition of Penney's finance charge") were components of the underlying sales transaction and could not be separated. In *Rena–Ware,* we refused to follow this argument and found the business activity of servicing credit accounts to be a business separate and

apart from the sales transaction which gave rise to the credit account. No doubt the majority can ignore this analysis if it chooses. It is difficult to put much faith in the consistency of judicial analysis if the chief guideline appears to be that the taxpayer will pay. At the very least, the majority ought to announce it has overruled *Rena-Ware*.

The other part of the majority position seems to be that Rena-Ware was small and Penney is big: "A traveling salesman selling cookware is hardly in the same retailers' league as is Penney." Majority opinion, at 45. I would suppose legislation could be passed which would have a different standard for door-to-door salespersons and giant retailers. The legislature did not choose to do so. Nor should we. We are bound by the terms of the statute which apply to large and small alike.

It is true that Penney engages in extensive credit sales activities within Washington. These activities consist principally in processing credit card purchases, handling credit applications, and handling merchandise returns, all of which are directly related and attributable to the generation of retail credit sales. Simply because a Penney customer maintains a continuing credit relationship or credit line with a local retail outlet does not change the essential fact that such relationship, from the perspective of the credit-related activities of the retail outlet, is related solely to the credit sale side of the transaction.

In *Rena-Ware,* the company's generation of service charge income would not have been possible but for the initial sale contact made by the out-of-state salesperson. In the case of Penney's retail activities, however, a retail credit sale does not automatically give rise to finance charge income as in *Rena-Ware,* nor does the mere fact that such sales contacts are repeated and continuing change their essential nature as being sales related.

Finance charge income cannot, of course, be generated without there first being credit sales. There is a clear, factual boundary, however, between a retail credit sale and the

generation of finance charge income. The occurrence of a credit sale is not an appropriate bridge to the contention that the business activities responsible for the finance charge income include all the activities of Penney performed in Washington directed to the generation of credit sales.

The granting of credit is a part of the retailing business and is a cost of that business. If the customer pays within, say, 30 to 60 days, so that there is no service charge, the cost of providing credit becomes a cost of doing retail business. The enhancement of business which the retailer hopes will come from the extension of credit is, of course, already taxed by the State in its assessment of the business and occupation tax against the gross retail sales. RCW 82.04-.250.

All of the functions essential to the generation and collection of finance charges—recording of credit card transactions, preparation of billing statements, crediting of account payments, and monitoring and enforcement of delinquent accounts—were the responsibility of and were performed at the Portland credit office. The logic of the reasoning in *Rena–Ware* supports the conclusion that Penney "engaged" in the "business activities" responsible for producing the finance charge income solely at its Portland credit office and not within the State of Washington.

The majority cites *J.C. Penney Co. v. Hardesty*, 264 S.E.2d 604 (W. Va. 1979). The case is not in point; it is barren of the analysis used by this court in *Rena–Ware*. The West Virginia court uses a "substantial contacts" analysis to justify imposition of the tax (Miller, J., concurring, at 618). It does not discuss or analyze the question of whether the servicing of credit accounts is a business separate and distinct from the retail sale giving rise to the credit account.

The case of *Department of State Revenue v. J.C. Penney Co.*, ___ Ind. App. ___, 412 N.E.2d 1246 (1980), is likewise not relevant. The Indiana court uses a "minimal activity" analysis to hold the tax inapplicable. Again, as in *Hardesty*,

56

this court fails to engage in the kind of analysis which is set forth in *Rena–Ware* to determine whether there was a "business activity".

I can well understand the desire of the State to get all the revenue it can. I do have difficulty sympathizing with the State shifting its analysis of the characteristics of the credit and service charge activities of a retailer as it suits its purpose. While it may be this is a natural and inevitable characteristic of the taxing authorities, I see no reason why the court should become a party to this duplicity.

BRACHTENBACH, C.J., concurs with DOLLIVER, J.

Reconsideration denied December 17, 1981.