# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| CITIBANK (SOUTH DAKOTA), NATIONAL ASSOCIATION, | No. 57127-7-II |
| Appellant, | |
| v. | UNPUBLISHED OPINION |
| STATE OF WASHINGTON DEPARTMENT OF REVENUE, | |
| Respondent. | |

MAXA, P.J. – Citibank (South Dakota), National Association (Citibank) appeals the Board of Tax Appeals' grant of summary judgment in favor of the Department of Revenue (DOR) regarding the assessment of over $6 million in business and occupation (B&O) taxes from January 1, 2007 through May 31, 2010. Citibank had challenged DOR's determination that Citibank was subject to B&O taxes because it had engaged in business in Washington during the relevant period.

Citibank is a commercial bank with its headquarters in South Dakota. Citibank does not have a place of business or any employees or property within Washington. However, during the assessment period Citibank generated over $1.7 billion in interest and fee income from issuing credit cards to Washington residents. Some of these credit cards were private label, store branded cards that could only be used at certain retailers. Pursuant to agreements with Citibank, these retailers were obligated to market the credit cards and distribute marketing materials to

customers in their Washington stores in order to solicit new accounts for Citibank. In addition, Citibank used Washington attorneys to file over 3,000 lawsuits in Washington courts to collect unpaid debts owed by Washington residents during the relevant period.

Before June 2010, former RCW 82.04.220 (1961) provided that a B&O tax would be collected from every person "for the act or privilege of engaging in business activities." Effective June 1, 2010, the legislature amended this statute to state that a B&O tax would be collected from every person "*that has a substantial nexus with this state . . .* for the act or privilege of engaging in business activities." Former RCW 82.04.220 (2010) (emphasis added).

Citibank asserts that before the 2010 amendment, the term "engaging in business activities" in RCW 82.04.220 required that a business have a physical presence in Washington to be subject to B&O taxes. Citibank argues that it could not be subject to B&O taxes before June 2010 because it did not have a physical presence in Washington.

DOR acknowledges that before June 2010, its policy and procedure was to assess B&O taxes against out-of-state businesses only when they had a physical presence in Washington. But DOR argues that even though there was a physical presence requirement under RCW 82.04.220 before June 2010, Citibank's activities satisfied that requirement in two ways: (1) having a contractual relationship with retailers to promote private label credit cards issued by Citibank to Washington consumers, and (2) continuously using Washington courts to collect unpaid debts from Washington residents.

A second issue involves DOR's apportionment of Citibank's gross income to its Washington activities based on WAC 458-20-14601. DOR apportioned Citibank's income to Washington based on the billing addresses of Citibank cardholders. Citibank argues that even if it was subject to B&O taxes, no amount of income could be apportioned to Washington activities

because Citibank did not engage in any business activities in Washington. In addition, Citibank argues that WAC 458-20-14601 was an invalid regulation and was unconstitutional as applied.

We hold that (1) although before June 2010 a physical presence requirement existed for the imposition of B&O taxes on out-of-state businesses, Citibank's activities in Washington satisfied that physical presence requirement; and (2) the formula provided under WAC 458-20-14601(2)(b) was the correct formula to use to apportion Citibank's gross income to Washington activities and the regulation was not invalid or unconstitutional. Accordingly, we affirm the Board of Tax Appeals' final decision granting summary judgment in favor of DOR.

FACTS

*Background*

Citibank is a commercial bank with its headquarters in South Dakota. During the assessment period at issue in this appeal, Citibank did not have a place of business in Washington and did not have any employees or property within Washington. All Citibank employees worked at business locations outside of Washington.

Citibank was engaged in the business of originating, managing, and servicing unsecured revolving consumer loans as a credit card issuer. Citibank issued credit cards to customers throughout the United States, including in Washington. A majority of the credit cards that Citibank issued were general credit cards, including Visa and MasterCard, which could be used at any location that accepted the cards. Citibank also issued private label, store-branded credit cards that could be used only at the designated retailers. These cards generally bore the name and logo of the retailer. Finally, Citibank issued co-branded credit cards that could be used at the designated retailers as well as at other locations as a general credit card.

Citibank generated income through four general categories: (1) interest income received from cardholders that did not pay their outstanding amounts due within the applicable grace period; (2) interchange income from retailers, issuing banks, and third-party retailers with whom Citibank entered into private label agreements; (3) fee income for the provision of services for cardholders, such as annual fees, cash advance fees, balance transfer fees, and late payment fees; and (4) income from trading and investment activities outside of Washington.

Citibank earned gross income attributable to Washington in the following amounts: (1) $360,355,363 in 2007, (2) $421,068,521 in 2008, (3) $492,478,463 in 2009, and (4) $452,621,110 in 2010. Total income during this period exceeded $1.7 billion.

During the assessment period, Citibank used Washington counsel to file more than 3,000 collection actions in Washington courts to collect debts owed by defaulting Washington residents.

*Private Label Agreements*

Citibank entered into private label credit card agreements (PL agreements) with various retailers, including three retailers that operated in Washington – Home Depot U.S.A., Inc. (Home Depot), Sears, Roebuck and Co. (Sears), and Federated Department Stores, Inc. (Federated). The PL agreements generally provided that Citibank and the retailers would cooperate in the development of marketing plans for the private label cards. Citibank and the retailers agreed to review all marketing plans to support the growth of Citibank's private label card program. Pursuant to the agreements, Citibank and the retailers established joint management committees to review policy and marketing operations.

The PL agreements also required the retailers' employees to market the credit cards and distribute marketing materials to in-store customers in order to solicit new accounts. For

4

example, the agreement with Home Depot required Home Depot to "prominently display" credit card applications at all retailer locations and to use "reasonable efforts" to promote the program. Admin. R. (AR) at 226. Marketing plans included in-store programs such as sales associate incentives and customer events. The Sears agreement required Sears to have its store employees market and support the private label credit card program. The Federated agreement required Federated to solicit new accounts through "in-store credit procedures" and display credit card applications, and to pay sales associates compensation for soliciting new accounts. AR at 1318. Except as carried on by the retailers as provided for in the agreements, Citibank did not carry out any solicitation activities in Washington related to the private label cards.

In addition, the PL agreements provided that the retailers could accept in-store payments for the private label cards. Under the agreement with Sears, when Sears received an in-store payment, it was deemed to hold the payment in trust for Citibank until the payment was either delivered to Citibank or applied to reduce the amounts payable to Sears by Citibank.

*Tax Audit and Subsequent Proceedings*

Citibank did not file any Washington B&O tax returns between January 1, 2007 and May 31, 2010. DOR audited Citibank with respect to this period and assessed an outstanding liability of $6,010,265 in B&O tax under the service and other activities classification, a delinquency penalty of $1,104,440, a five percent assessment penalty of $300,513, and $775,368 in interest.

To determine gross taxable income attributable to Washington, DOR divided Citibank's total credit card receivables from Washington residents by Citibank's total gross income, and divided that number by three. This apportionment method was dictated by WAC 458-20-14601. DOR's apportionment computation from gross income attributable to Washington was based on Citibank's receipts, which were measured solely on the billing address of the credit card holders.

5

Citibank filed an appeal petition with respect to DOR's assessment. The DOR Appeals Division affirmed the assessment.

Citibank appealed to the Board of Tax Appeals. Citibank and DOR filed cross-motions for summary judgment. The Board granted summary judgment in favor of DOR, affirming DOR's determinations. The Board found that, as Citibank conceded, Citibank's activities met the constitutional standards for imposition of Washington's B&O tax. The Board concluded that the agreements with retailers requiring the retailers to promote and support Citibank's credit cards and Citibank's lawsuits in Washington courts "were sufficient to constitute nexus during the audit period, whether characterized as a 'physical presence' or not." AR at 67. The Board further found that "the activities of third parties, performed on behalf of a taxpayer, can constitute sufficient nexus to support the assessment of tax." AR at 67.

Citibank then paid the disputed tax assessment in the total amount of $9,725,485.10 and appealed to the superior court. The superior court transferred the case to this court for direct review pursuant to RCW 34.05.518.

Citibank appeals the Board of Tax Appeals' final decision granting summary judgment in favor of DOR.

## ANALYSIS

### A.    STANDARD OF REVIEW

We review decisions of the Board of Tax Appeals under the Administrative Procedures Act (APA), chapter 34.05 RCW. *Echo Glob. Logistics, Inc. v. Dep't of Revenue*, 22 Wn. App. 2d 942, 945, 514 P.3d 704, *review denied*, 200 Wn.2d 1020 (2022). Under the APA, we may grant relief from an agency's order based on one of nine reasons listed in RCW 34.05.570(3), including that the order is based on an erroneous interpretation or application of the law. RCW

34.05.570(3)(d). We review alleged errors of law de novo. *Greenfield v. Dep't of Lab. and Indus.*, 27 Wn. App. 2d 28, 44, 531 P.3d 290 (2023). The party challenging the agency's decision has the burden of demonstrating the invalidity of that decision. RCW 34.05.570(1)(a).

When an administrative decision is decided on summary judgment, we overlay the APA and summary judgment standards of review. *Waste Mgmt. of Wash.*, *Inc. v. Wash. Utils. and Transp. Comm'n*, 24 Wn. App. 2d 338, 344, 519 P.3d 963 (2022), *review denied*, 1 Wn.3d 1003 (2023). We review the ruling de novo and construe the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Id.* Here, the parties do not dispute the material facts. Summary judgment can be determined as a matter of law if the material facts are not in dispute. *Antio, LLC v. Dep't of Revenue*, 26 Wn. App. 2d 129, 134, 527 P.3d 164 (2023).

B.       IMPOSITION OF B&O TAXES

Citibank argues that it is not subject to B&O taxes for the 2007-2010 period because during that period DOR imposed B&O taxes only on businesses that had a physical presence in Washington, and Citibank did not have such a physical presence. We hold that even though before June 2010 there was a physical presence requirement for the imposition of B&O taxes, Citibank's activities in Washington satisfied that requirement.

1.    Scope of B&O Tax

Before June 2010, former RCW 82.04.220 provided, "There is levied and shall be collected from every person a tax for the act or privilege of engaging in business activities." As reflected in the statutory language, this B&O tax is an excise tax imposed for the privilege of doing business in Washington. *Ford Motor Co. v. City of Seattle*, 160 Wn.2d 32, 39, 156 P.3d 185 (2007). The term "business" is defined to include "all activities engaged in with the object

of gain, benefit, or advantage to the taxpayer or to another person or class, directly or indirectly." RCW 82.04.140.

"In adopting our State's B & O tax system 'the legislature intended to impose the business and occupation tax upon virtually all business activities carried on within the state.' " *Simpson Inv. Co. v. Dep't of Revenue*, 141 Wn.2d 139, 149, 3 P.3d 741 (2000) (quoting *Time Oil Co. v. State*, 79 Wn.2d 143, 146, 483 P.2d 628 (1971)). "The B&O tax is to be imposed as broadly as constitutionally allowed." *Avnet, Inc. v. Dep't of Revenue*, 187 Wn.2d 44, 51, 384 P.3d 571 (2016).

A state may tax on an out-of-state business only if the requirements of the due process clause of the Fourteenth Amendment and the commerce clause[1] of the United States Constitution are satisfied. *Lamtec Corp. v. Dep't of Revenue*, 170 Wn.2d 838, 843, 246 P.3d 788 (2011). Due process requires that the business being taxed has sufficient contacts with the taxing state. *Id.* The commerce clause imposes several requirements, including that the tax be " 'applied to an activity with a substantial nexus with the taxing State.' " *Id.* at 844 (quoting *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S. Ct. 1076, 51 L. Ed. 2d 326 (1977)).

In *Quill Corp. v. North Dakota*, the United States Supreme Court noted that due process is satisfied when an out-of-state corporation "purposefully avails itself of the benefits of an economic market in the forum State . . . even if it has no physical presence in the State." 504 U.S. 298, 307, 112 S. Ct. 1904, 119 L. Ed. 2d 91 (1992), *overruled by S. Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 201 L. Ed. 2d 403 (2018). But the Court confirmed that the commerce clause mandated a physical presence requirement for sales and use taxes imposed on mail-order businesses. *Id.* at 311, 317. The Court stated, "Whether or not a State may compel a vendor to

---

[1] U.S. Const., article I, § 8, cl. 3.

collect a sales or use tax may turn on the presence in the taxing State of a small sales force, plant, or office." *Id.* at 315.

However, in 2011 our Supreme Court in *Lamtec* noted that the great weight of authority in other jurisdictions had limited the holding in *Quill* to sales and use taxes and had refused to apply the physical presence requirement to other kinds of taxes. *Lamtec*, 170 Wn.2d at 848-49.

2. 2010 Amendment to RCW 82.04.220

Effective June 1, 2010, the legislature amended RCW 82.04.220 to read as follows: "There is levied and collected from every person *that has a substantial nexus with this state* a tax for the act or privilege of engaging in business activities." Former RCW 82.04.220 (emphasis added).

Regarding the 2010 amendment to RCW 82.04.220 and other related amendments, the legislature provided the following findings:

> *The legislature finds that out-of-state businesses that do not have a physical presence in Washington earn significant income from Washington residents* from providing services or collecting royalties on the use of intangible property in this state. The legislature further finds that these businesses receive significant benefits and opportunities provided by the state, such as: Laws providing protection of business interests or regulating consumer credit; access to courts and judicial process to enforce business rights, including debt collection and intellectual property rights; an orderly and regulated marketplace; and police and fire protection and a transportation system benefiting in-state agents and other representatives of out-of-state businesses. Therefore, *the legislature intends to extend the state's business and occupation tax to these companies to ensure that they pay their fair share of the cost of services that this state renders and the infrastructure it provides*.

LAWS OF 2010, ch. 23, § 102 (emphasis added).

3. Physical Presence Requirement

Former RCW 82.04.220 had no express physical presence requirement. The only express requirement was "engaging in business activities." Former RCW 82.04.220. But DOR

acknowledges that its policy and procedure before June 2010 was to assess B&O taxes against out-of-state businesses only when they had a physical presence in Washington.

Therefore, during the assessment period DOR would not have imposed B&O taxes on Citibank unless Citibank had a physical presence in Washington.

4. Citibank's Physical Presence in Washington

DOR argues that Citibank's activities satisfied the physical presence requirement in two ways: (1) having a contractual relationship with retailers to promote private label credit cards issued by Citibank to Washington consumers, and (2) continuously using Washington courts to collect unpaid debts from Washington residents. We agree.

a. Legal Principles

In analyzing whether Citibank had a sufficient physical presence in Washington, the parties seem to equate physical presence under former RCW 82.04.220 with physical presence under the commerce clause's nexus standard.

The Supreme Court in *Lamtec* addressed whether there was a physical presence requirement to establish a substantial nexus with the taxing state under the commerce clause. 170 Wn.2d at 844-46. The court stated,

> *[T]o the extent there is a physical presence requirement, it can be satisfied by the presence of activities within the state.* It does not require a "presence" in the sense of having a brick and mortar address within the state. We do not see a material difference whether the activities are performed by staff permanently employed within the state, by independent agents contracted to perform the activity within the state, or persons who travel into the state from without. The activities must be substantial and must be associated with the company's ability to establish and maintain the company's market within the state.

*Id.* at 850-51 (emphasis added). The court held that Lamtec's practice of sending sales representatives to Washington to meet with customers satisfied the constitutional nexus requirement even though Lamtec did not have a permanent presence within the state. *Id.* at 851.

In *Lamtec*, the Supreme Court discussed *Tyler Pipe Industries v. Department of Revenue*, 105 Wn.2d 318, 715 P.2d 123 (1986), *vacated in part*, 483 U.S. 232, 107 S. Ct. 2810, 97 L. Ed. 2d 199 (1987).[2]  *Lamtec*, 170 Wn.2d at 849-50.  Tyler Pipe distributed pipe and fittings nationwide with its principal place of business in Texas.  *Tyler Pipe*, 105 Wn.2d at 320.  While it did not have a place of business or employees within Washington, Tyler Pipe hired independent contractors to act as sales representatives within Washington.  *Id.* at 320-21, 324.  The court stated that "the crucial factor governing nexus is whether the activities performed in this state on behalf of the taxpayer are significantly associated with the taxpayer's ability to establish and maintain a market in this state for the sales."  *Id.* at 323.  The court concluded that the difference between employees and independent contractors lacked constitutional significance in applying the nexus standard.  *Id.* at 324.  And there was a substantial nexus between Tyler Pipe and Washington because the sales representatives acted daily on behalf of Tyler Pipe, provided Tyler Pipe with almost all of their information about the Washington market, and maintained and improved Tyler Pipe's market share.  *Id.* at 325.

Commenting on *Tyler Pipe* and noting that the United States Supreme Court in Tyler Pipe quoted the above passage from the Washington Supreme Court opinion, the court in *Lamtec* stated, "We agree with [DOR] that the 'crucial factor' in this language is that the activities were 'significantly associated with the taxpayer's ability to establish and maintain' its market."  170 Wn.2d at 850 (quoting *Tyler Pipe*, 483 U.S. at 250-51).

In *Department of Revenue v. J. C. Penney Co.*, J.C. Penney operated over 50 retail stores in Washington and supplied credit cards to its customers there.  96 Wn.2d 38, 39-40, 633 P.2d

---

[2] The United States Supreme Court reversed this case on other grounds, but affirmed the Washington Supreme Court's holding that an adequate nexus existed to support a state tax. *Lamtec*, 170 Wn.2d at 850.

870 (1981). Credit card applications could be obtained at a local store. *Id.* at 40. Local store employees solicited the credit card applications and helped customers fill them out. *Id.* The completed applications were sent to J.C. Penney's regional credit office in Portland, Oregon, which then determined whether the applicant would receive a charge card and would establish the applicant's credit limit. *Id.* J.C. Penney's credit office also handled the billing on the credit card accounts and generated income from the finance charges on the credit sales. *Id.* at 40-42.

DOR sought to tax the service charge income. *Id.* at 41. J.C. Penney argued that its finance charge income was not subject to B&O taxes because all activities relating to the imposition of the service charges occurred in Oregon. *Id.* at 42. The Supreme Court disagreed, stating, "It is the credit sale which places Penney in the position of potentially receiving a finance charge. The local activities which promote the sale on credit are sufficient to bring the finance charge income within the taxing statute." *Id.* at 44. The court concluded, "We cannot construe the facts before us to support a finding that Penney does not engage in any business activity in Washington which gives rise to a finance charge." *Id.* at 47. Therefore, the court upheld imposition of the tax. *Id.* at 48.

b. Analysis

Here, Citibank did not have a place of business or any employees or property within Washington. But under *Lamtec*, the question is whether Citibank engaged in *activities* within Washington sufficient to satisfy the physical presence requirement that existed before June 2010. *See* 170 Wn.2d at 850-51. We conclude that Citibank did engage in such activities.

First, Citibank entered into contractual relationships with three retailers – Home Depot, Sears, and Federated – to promote private label credit cards that were issued by Citibank to Washington consumers. These agreements expressly required the retailers to market Citibank's

12

private label credit cards *in their stores*, some of which were located in Washington. Marketing included displaying credit card applications in the stores and having store employees market the credit cards. These activities were " 'significantly associated with the taxpayer's ability to establish and maintain' its market." *Lamtec*, 170 Wn.2d at 850 (quoting *Tyler Pipe*, 483 U.S. at 250-51).

These arrangements may not have risen to the level of the activities of the sales representatives in *Lamtec* or the local agents in *Tyler Pipe*, but there is no question that Citibank was working with Washington stores and Washington store employees to sign up Washington residents for its credit cards. In this way, the facts here are similar to the involvement of the store employees in *J.C. Penney*. And issuing more credit cards to Washington residents allowed Citibank to generate more income from fees and interest. We conclude that the operation of Citibank's PL agreements was sufficient to establish a physical presence in Washington.

Second, the PL agreements authorized the retailers to accept payments from its customers on behalf of Citibank on amounts the customers owed to Citibank. As a result, the retailers facilitated Citibank's collection of income in Washington.

Third, Citibank used Washington attorneys to file more than 3,000 lawsuits against Washington residents in Washington courts to recover unpaid debts. These attorneys clearly were acting on behalf of Citibank, akin to the local agents in *Tyler Pipe*. As a result, Citibank was physically present in Washington, through its attorneys, almost on a daily basis.

Citibank argues that Citibank's Washington lawsuits cannot satisfy the physical presence requirements because they constituted the exercise of creditor rights, not the generation of gross income. But the issue here is physical presence, not whether that presence generated income. Citibank also argues that the Washington lawsuits are immaterial because they did not involve

13

establishing or maintaining a market, as referenced in *Lamtec*, 170 Wn.2d at 850-51. To the extent that activities must help establish or maintain a market in order to constitute a physical presence, collecting unpaid debts could be considered maintaining an existing market.[3]

Each one of these factors standing alone may not have been sufficient to establish a physical presence in Washington. But together, these factors show that Citibank was physically present in Washington. Therefore, we hold that Citibank met the pre-June 2010 physical presence requirement of RCW 82.04.220 through its activities within Washington.

C.      APPORTIONMENT OF GROSS INCOME

Citibank argues that even if it was subject to B&O taxes, no amount of income could be apportioned to Washington activities because (1) Citibank did not engage in any business activities in Washington, (2) WAC 458-20-14601 is an invalid regulation because it was inconsistent with former RCW 82.04.220, and (3) WAC 458-20-14601 is unconstitutional as applied to Citibank. We disagree.

1.      Legal Principles

Former RCW 82.04.460(2) (2004) required any person doing business within and without of Washington who was receiving gross income from engaging in business as a financial institution to apportion their taxable gross income to Washington pursuant to rules adopted by DOR. Those rules are stated in WAC 458-20-14601,[4] which provide the apportionment

---

[3] Citibank argues that it did not meet the physical presence requirement because under former RCW 82.04.460(1) (2004), it was required to maintain a place of business within Washington. Subsection (1) referenced maintaining a place of business in Washington. But subsection (2), not subsection (1), applied to financial institutions. Subsection (2) merely required an entity to *do business* within and without of Washington, not to *maintain a place of business*.

[4] WAC 458-20-14601 was amended after the assessment period, but the amendments are not material here. Therefore, we cite to the current version of the regulation.

requirements for financial institutions that did business inside and outside of Washington and incurred tax liability through May 2010.

> WAC 458-20-14601(2)(b) states,

> The apportionment percentage is determined by adding the taxpayer's receipts factor (as described in subsection (4) of this section), property factor (as described in subsection (5) of this section), and payroll factor (as described in subsection (6) of this section) together and dividing the sum by three. If one of the factors is missing, the two remaining factors are added together and the sum is divided by two. If two of the factors are missing, the remaining factor is the apportionment percentage. A factor is missing if both its numerator and denominator are zero, but it is not missing merely because its numerator is zero.

The receipts factor is a fraction where the numerator is the gross income of the taxpayer in Washington and the denominator is the gross income of the taxpayer inside and outside of Washington. WAC 458-20-14601(4)(a). When a credit card holder has a billing address in Washington, then the numerator of the receipts factor includes interest and fees from credit card receivables and income from card holder fees. WAC 458-20-14601(4)(g).

> WAC 458-20-14601(2)(d) provides for the use of an alternative apportionment method

under certain circumstances:

> If the allocation and apportionment provisions of this section do not fairly represent the extent of its business activity in this state, the taxpayer may petition for, or the department may require, in respect to all or any part of the taxpayer's business activity:

> (i) Separate accounting;

> (ii) A calculation of tax liability utilizing the cost of doing business method outlined in RCW 82.04.460(1);

> (iii) The exclusion of any one or more of the factors;

> (iv) The inclusion of one or more additional factors which will fairly represent the taxpayer's business activity in this state; or

> (v) The employment of any other method to effectuate an equitable allocation and apportionment of the taxpayer's receipts.

2. Business Activities in Washington

Citibank argues that even if it was subject to B&O taxes, no amount of income could be apportioned to Washington activities because it did not engage in any business activities in Washington. Citibank emphasizes that under former RCW 82.04.220, B&O taxes applied only to business activities occurring in Washington. Citibank repeatedly claims that the stipulated facts establish that it had no business activities in Washington. And Citibank asserts that it is undisputed that all of its activities – transaction processing, loan accounting, funding, management of receivables, marketing and negotiation with retailers – occurred outside of Washington.

Based on its position that it had no business activities in Washington, Citibank argues that the standard apportionment formula in WAC 458-20-14601(2)(b) cannot be applied. Instead, the alternative methods in WAC 458-20-14601(2)(d) must be used because subsection (2)(b) did not "fairly represent the extent of its business activity in this state."

First, the stipulated facts do not establish that Citibank had no business activities in Washington. The stipulation stated only that Citibank had no employees or property in Washington. And the stipulation stated that Citibank issued credit cards to consumers in Washington and generated interest and fee income from those cardholders.

Second, Citibank's argument requires us to determine the usual and ordinary meaning of the term "business activities" in the context of a credit card issuer. *See Ekelmann v. City of Poulsbo*, 22 Wn. App. 2d 798, 807, 513 P.3d 840 (2022). Citibank focuses on where the employees managing the credit card business are located. But it is undisputed that Citibank issued credit cards to thousands of Washington residents and earned $1.7 billion from those Washington credit cards during the assessment period. We conclude that the usual and ordinary

16

meaning of the term "business activities" includes issuing credit cards in Washington and earning substantial income from those credit cards, regardless of where those credit cards are managed.

In addition, requiring retailers to market Citibank's credit cards in the PL agreements and filing lawsuits in Washington to collect unpaid debts as discussed above also fall within the usual and ordinary meaning of the term "business activities."

Third, because issuing credit cards to Washington residents constitutes business activities, apportioning gross income to Washington based on the billing address of cardholders under WAC 458-20-14601(4)(g) does "fairly represent the extent of [Citibank's] business activity in this state," which means that the alternative methods listed in WAC 458-20-14601(2)(d) are inapplicable.[5]

We hold that DOR's use of the apportionment formula in WAC 458-20-14601(2)(b) to determine Citibank's gross income attributable to Washington was appropriate.

3.    Validity of Regulation

Citibank argues that WAC 458-20-14601 is an invalid regulation because it is inconsistent with the "business activities" requirement in former RCW 82.04.220.  However, this argument is based on Citibank's position that it did not engage in any business activities in Washington.  As discussed above, this position is incorrect.  Therefore, we reject this argument.

4.    Constitutional Claim

Citibank argues that WAC 458-20-14601 as applied is unconstitutional because the tax assessed under that regulation is out of proportion to the business Citibank performed in

---

[5] Further, there is no indication that Citibank petitioned DOR for use of an alternative apportionment method as referenced in WAC 458-20-14601(2)(d).

Washington and because Citibank did not perform or manage the services and transactions that led to the taxed credit card receivables within Washington.

Both the due process and commerce clauses require a state's apportionment formula to be fair. *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 169, 103 S. Ct. 2933, 77 L. Ed. 2d 545 (1983).

> The first, and again obvious, component of fairness in an apportionment formula is what might be called internal consistency – that is the formula must be such that, if applied by every jurisdiction, it would result in no more than all of the unitary business's income being taxed. The second and more difficult requirement is what might be called external consistency – the factor or factors used in the apportionment formula must actually reflect a reasonable sense of how income is generated.

*Id.* The United States Supreme Court in *Container Corp.* stated that it would strike down an apportionment formula if the taxpayer could show by clear and cogent evidence that the income allocated to a state was out of proportion to the business conducted in that state. *Id.* at 170.

Once again, the premise of Citibank's constitutional argument – that it did not engage in any business activities in Washington – is incorrect.

Regarding the *Container Corp.* analysis, the internal consistency requirement is satisfied by focusing only on where Citibank's cardholders reside. WAC 458-20-14601(4)(g) guarantees that there will not be double taxation by some other state where those cardholders do not reside. The external consistency requirement is satisfied because Citibank's income is generated by issuing credit cards and collecting gross income from Washington residents, and the apportionment formula allocates income only from those residents.

We hold that the formula applied to Citibank under WAC 458-20-14601 was not unconstitutional.

CONCLUSION

We affirm the Board of Tax Appeals' final decision granting summary judgment in favor

of DOR.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

_____

MAXA, P.J.

We concur:

_____

VELJACIC, J.

_____

CHE, J.